ORIGINAL

FILED
JUL 1 7 2007
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AXIOM RESOURCE MANAGEMENT, INC.

Plaintiff,

v.

THE UNITED STATES

Defendant.

CoFC No. 07-532 C
**BID PROTEST**

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

**COMES NOW** Plaintiff Axiom Resource Management, Inc. ("Axiom"), by and through the undersigned counsel, and hereby protests the failure of the United States Department of Army (the "Army"), through its Contracting Officer, Daniel Signore, U.S. Army Medical Research Acquisition Activity, Fort Detrick, Maryland. The basis for the requested equitable relief is that Axiom objects to the Department of the Army's (the "Army's") failure to comply with the terms of Request for Quotations No. 154160 (under Contract No. GS-10F-0065N) (the "Solicitation" or the "RFQ") and the requirements of the applicable statutes and regulations in the evaluation of Axiom's proposal submitted in response to the RFQ.

Specifically, although Axiom advised the Army of deficiencies in the agency's evaluation of Axiom's proposal after the initial contract award, the Army took no action to address these deficiencies and has apparently re-confirmed its award decision. Consequently, the Army's technical evaluation remains defective in that it failed to properly score Axiom's technical proposal, and failed to properly evaluate Axiom's past performance. Furthermore, although the Army claimed to the Comptroller General that it intended to take corrective action including

conducting further analysis with regard to the organizational conflict of interest ("OCI") identified by Axiom and issue a new source selection decision, the Army has simply ignored the problem and decided to go forward with the contract awarded to Lockheed Martin Federal Healthcare ("LMFH"). Once again such action is clearly improper because the awardee possesses an OCI, its existing alleged mitigation plan is inadequate, and there is a strong potential for future OCIs that the Government has failed to consider or adequately address. The Government twice claimed it was going to take corrective action to resolve the OCI issue; however, the record in this matter clearly demonstrates that the Army has utterly failed to understand the nature of the services being procured here, the nature of the organization for which these services are to be provided, and the nature of the OCIs caused by the present award to LMFH. Additionally, the agency's failure raises the real possibility of future OCIs because of LMFH's performance of this contract.

The Agency Report ("AR") at the GAO purports to support the contracting officer's actions here by asserting that the technical evaluation of Axiom was valid, that no discussions were required with Axiom, and that even if there is a an OCI arising from the award to LMFH the awardee has proposed a plan allegedly mitigating the OCIs. As to the OCI the Government's analysis is based on a fallacious distinction between purchased care and non-purchased care and an over reliance on LMFH's proposed mitigation plan.

By this filing, and the accompanying Request for Temporary Restraining Order and Motion for Preliminary Injunction, Axiom seeks an order enjoining the Government from taking the actions described above or in the alternative enjoining the Army from employing the funds obligated to the performance of a contract to provide the services required under Request for Quotations No. 154160 of any contract awarded to LMFH or any entity other than the Plaintiff

for these services. Finally, Axiom also seeks its attorney's fees and its costs in bringing this action.

## Parties

1. Plaintiff Axiom is a corporation and whose principal office is located in Falls Church, Virginia. Axiom is engaged in the business of providing program management and professional services to Government and commercial clients worldwide.

2. The Defendant is the United States of America through the Department of the Army.

## Jurisdiction

3. Jurisdiction in this Court is based on the Tucker Act, 28 U.S.C. § 1491.

## Factual Assertions

### A. The Procurement

4. The Army acting through the U.S. Army Medical Research Acquisition Activity issued the RFQ as a competitive task order under an existing contract. Only offerors with the appropriate contract under the Federal Supply Schedule were permitted to submit offers in response to the RFQ. The Performance Based Statement of Work ("PBSOW") associated with the RFQ states that the Army was seeking services in support of the TRICARE medical care system. TRICARE provides medical services to military members, retirees and their families worldwide. According to the RFQ:

> This award provides for program management support services to the TRICARE Acquisitions Directorate (TAD) to operationalize the TRICARE program. Services provided by the Contractor shall include supporting Integrated Project Teams and Working Integrated Project Teams, maintaining project milestone charts, and preparing documentation as necessary. Program activities supported shall include, but are not necessarily limited to, Claims Processing, HIPAA compliance, DEERS

and TEDS support, General Counsel administrative support, as well as support for the T-3 suite of contracts.

PBSOW, ¶ 1.0.

5. Axiom is the incumbent contractor for the work sought by the current RFQ.

6. The RFQ stated that the Army's award decision will be based on the following:

Award of this task order will be made on a competitive best value basis, using "tradeoff" among cost/price and non-cost/price factors. The Government may elect to award to an Offeror who is not the lowest bidder. If the award is made to the superior technical Offeror, then a cost/technical tradeoff will have to be determined and qualified. Non-Cost/Price factors will include Technical Approach, Experience, Quality Control Approach, and Past Performance.

RFQ, ¶ T.1.1.1.

7. The RFQ stated that an offeror's past performance would be evaluated as follows:

The degree to which past performance evaluations either included in the proposal or identified by the evaluators in any other manner, reflect success in the Tasks outlined in the PBSOW Section 2.2 and the degree to which these evaluations of past performance reflect a management approach that encourages customer satisfaction and collaboration. The offeror must provide a list of at least 3 but no more than 5, references of relevant past and present contracts for Federal, State and/or City agencies and commercial customers within the past 3 years. "Relevant" is defined as like service as stated in this solicitation's Statement of Work in terms of similar scope and complexity. References must include:

Name of the Organization that will be providing the reference,
Name of the Point of Contact (POC),
POC Telephone Number,
POC Email address,
Contract Number,
Period of Performance, and
Scope of Work.

The Government may also consider information obtained through other sources. Past performance information will be utilized to determine the quality of the contractor's past performance as it relates to the probability of success of the required effort. Ensure that contract information is accurate and up-to-date, as references will be checked.

RFQ, ¶ T.1.1.3.4.

8. Axiom submitted four past performance references including one from the contracting officer's representative ("COR") for the incumbent contract.

9. The RFQ also discussed the nature of its organization and the potential of OCI's on the part of the offerors:

> TRICARE Management Activity (TMA) has categorized all its non-purchased care requirements into three broad categories, as defined below, for purposes of identifying, avoiding or mitigating against Organizational Conflicts of Interest (OCIs) in accordance with FAR Subpart 9.5. These categories are defined as follows:
>
> • Category 1: TMA Internal Support: Services which, by their very nature, give the Contractor access to extensive data about the contracts of all other TMA contractors.
>
> • Category 2: Program Management Support: Services which assist TMA in planning and managing its activities and programs. This includes, for example: requirements analysis, acquisition support, budget planning and management, business process reengineering, program planning and execution support, and independent technical management support.
>
> • Category 3: Product Support. Services or end items required to meet the mission requirements of TMA's non-purchased care activities and programs. This includes, for example: concept exploration and development; system design; system development and integration; COTS procurement and integration; internal development testing; deployment; installation; operations; and maintenance.
>
> Contractor participation in more than one of these areas may give rise to an unfair competitive advantage resulting from access to advance acquisition planning, source selection sensitive or proprietary information. Furthermore, contractor participation in more than one area may give rise to a real or apparent loss of contractor impartiality and objectivity where its advisory or planning assistance in one area potentially affects its present or future participation in another area.
>
> The purpose of this categorization is to accomplish the following three objectives: (1) to inform prospective Offerors that TMA presumes that award of a contract or order in the subject category will give rise to real or

> apparent OCIs with respect to requirements in the other two categories; (2) to assist current contractors and prospective Offerors in developing their own business strategies regarding participation in TMA requirements and in identifying and, where possible, avoiding or mitigating against OCIs; and (3) to ensure that all current contractors and prospective Offerors are afforded the maximum practicable opportunity to compete for all TMA requirements consistent with the restrictions required under FAR Subpart 9.5 and sound business practices.

PBSOW, ¶ 1.4.

10. The RFQ further stated that the work under the solicitation fell within Category 2 contract work, which meant that Offerors performing either Category 1 or 3 contract work for TMA were subject to an OCI. Axiom performs only Category 2 work for TMA.

11. Conversely, LMFH currently provides system programming services under RFQ No. 93659 for the TRICARE Encounter Data process ("TED"), which is a Category 2 contract for the TRICARE organization, HPA&E. Axiom submitted a timely proposal in response to the RFQ.

**B. <u>Prior Proceedings</u>**

12. By letter, dated September 14, 2006, received by Axiom on September 19, 2006, the contracting officer informed Axiom that it was not the successful awardee under the RFQ, but that the Government intended to award a contract to LMFH. According to the contracting officer's letter while Axiom had no weaknesses in its technical proposal, Axiom's technical proposal was given a lower score than LMFH's technical proposal. The contracting officer's correspondence also stated that Axiom's cost proposal was in some way "overstated." No discussions were held with Axiom concerning any portion of its proposal.

13. The work to be provided under the RFQ here involves Category 2 support as described above. Upon information and belief LMFH currently provides Category 1 or 3

services to TMA and therefore has an unmitigated OCI preventing award of the current contract to the proposed awardee.[1]

14. Based on the information known to Axiom and the statements in the contracting officer's notice of award, Axiom by letter, dated September 25, 2006, filed a protest with the Comptroller General concerning the award. The protest was docketed as Axiom Resource Management, Inc., B-298870.

15. On October 18, 2006, the Government moved to partially dismiss Axiom's protest for failure to state a claim. In accordance with a schedule proposed by the Comptroller General, on October 24, 2006, Axiom opposed the Government's motion.

16. Subsequently on October 25, 2006, the contracting officer proposed to take corrective action and the Government requested that the protest be dismissed as moot. Specifically, the contracting officer stated that he intended to take corrective action to review the OCI related to LMFH's performance of both Category 1 and Category 3 services. Although the proposed corrective action failed to address Axiom's other protest grounds, the Comptroller General, over Axiom's objection, dismissed Axiom's protest as moot on October 31, 2006.

17. By letter, dated December 7, 2006, and received by Axiom on December 6, 2006, the contracting officer stated that it was his intention to award a contract under the RFQ to LMFH.

18. According to the contracting officer's award notice, the proposed awardee and Axiom were the only offerors.

---

[1] In a separate procurement conducted for TMA in 2005, the Army also allowed LMIT to perform Category 2 work for which it possessed an OCI. Axiom submitted an agency protest and in response, the Army acknowledged the potential for an OCI by declined to take corrective action. Because of the nature of agency protests, Axiom did not learn the precise nature of the other work being performed by LMIT for TMA.

19. Apparently, LMFH was rated Exceptional and Axiom was rated as Good; however a review of the contracting officer's award notice indicates that Axiom's proposal was not evaluated in accordance with the terms of the RFQ.

20. Specifically, Axiom's technical proposal was downgraded to merely Acceptable without any discussions between the Government and Axiom. Similarly, Axiom's past performance rating was identified as Good; however, the contracting officer only contacted two of Axiom's four past performance references, and one of the references **NOT** contacted was Axiom's reference for its performance of the incumbent contract for the services sought under the RFQ.

21. Finally, the Government contended that it has resolved the potential OCI because "LMFH does not currently provide any purchased care services [and] LMFH also provided a detailed mitigation plan"; however, the Government's notice provides no detail concerning the alleged mitigation plan. Furthermore, the mere fact that the Army has determined that there is no current OCI does not discharge the agency's obligation under the FAR to anticipate and address both actual and potential OCIs.

22. Based on the Government's failure to enforce the terms of the RFQ, Axiom filed a protest with the Comptroller General on December 7, 2006. On January 8, 2007, prior to the filing of the Agency Report, the Army informed the Government Accountability Office ("GAO") that it intended to take corrective action to address Axiom's OCI arguments. Based on the Army's assertions, the GAO dismissed Axiom's protest on January 16, 2007.

23. On April 2, 2007, Axiom was informed that LMFH's contract was to be reinstated, the stop work order rescinded and that LMFH was to begin performance on April 3, 2007. To

Axiom's knowledge no new source selection decision has been made, nor has the Army modified the RFQ to remove the unmitigable OCI language described above.

C. **The Continuing OCI**

24. The Army has identified that it is an OCI where one contractor provides either Category 1 or 3 services and then seeks to perform Category 2 services to the TMA.

25. The contracting officer has asserted that LMFH is not currently performing purchased care services; however, the RFQ clearly states that the problem is in regard to the provision of "non-purchased care services." PBSOW, ¶ 1.4. Therefore, the contracting officer's assurances here are inapposite and the obvious OCI has not been resolved.

26. LMFH has a contract with TRICARE to provide system programming services meaning that there is an unmitigated OCI. Even if the contracting officer is correct that LMFH is not providing any purchased care services for TRICARE, the nature of the Category 2 work and the identified awardee's business practices make it clear that an OCI remains.

27. In the current military healthcare environment, every plan, insurer and provider is becoming increasingly reliant upon information systems to improve upon their efficiencies and quality of care. Likewise, in the Military Health System ("MHS"), every essential operation and function has become dependent upon advanced health information management/information technology ("IM/IT") to successfully deliver the TRICARE benefit.

28. Today, the MHS is pursuing advanced health IT solutions for claims processing, electronic patient records, enrollment, appointing, patient referrals and authorizations—just to name a few. Category 3 organizations, such as Lockheed Martin Information Technology

("LMIT")[2], by dint of their intimate involvement in the design, development, integration, installation and maintenance of specific end items for the Department of Defense should inherently disqualify them from any activities that place them in the position of evaluating or effectively evaluating their own systems and programs (i.e., "impaired objectivity").

29. Unlike Category 3 contractors, Category 2 contractors must be able to provide unfettered and unbiased advice to MHS in evaluating the effectiveness of these vast and inter-related systems and programs.

30. In addition, by necessity, Category 2 contractors require access to the operational requirements of the TRICARE Acquisition Directorate. Direct access to program requirements, particularly in context of the current T-3 planning, provides specific operational details that shape IM/IT solutions. Clearly, were LMIT/LMFH to serve TRICARE as a Category 2 contractor not only would it occupy a position of impaired objectivity but it would also be gaining access to non-public information regarding advanced TRICARE acquisition planning that would give it an unfair competitive advantage in pursuing future Category 3 work.

**(1) The Current Award Violates the Intent of Statement of Work**

31. The PBSOW for the TAD contract support cites responsibilities for facilitating Integrated Project Teams and Working Integrated Project Teams, maintaining project milestone charts, and preparing documentation as necessary. This documentation is specifically identified as, "Concept of Operations ("CONOPS"), Functional Requirements Documents ("FRD"), risk assessments,

---

[2] For the purposes of this discussion Axiom's references to LMIT (a sister corporation to LMFH) should be considered to apply to LMFH.

implementation and compliance plans, cost estimates, and Change Management Fact Sheets.

32. The PBSOW clearly demonstrates the government-sensitive nature of activities required by the contract support. The contractor for TAD duties must become an extension of the government staff, and the government is obligated to ensure that there are no conflicting business interests that could be exploited due to the *Unequal Access to Information* (as described in numerous HA/TMA SOW) that could be used by the supporting contractor's firm.

33. The PBSOW also describes the "suite of contracts" that are envisioned with regard to the current T-3 acquisition process. The suite of contracts refers to the fact that not all deliberations for healthcare delivery are specifically related to the MCSCs. In the previous iteration of T-NEX, the suite of contracts sought administrative services, healthcare delivery, education and marketing, national retail pharmacy, TRICARE mail-order pharmacy, a healthcare information line, TRICARE Retiree Dental Program and national quality monitoring.

34. Consequently, any of these programs could be solicited separately from the MCSCs, or could be "carved-out" for procurement with a single contractor to implement the services centrally/nationally.

35. LMIT/LMFH, under the terms of the current award, would have access to the CONOPS, FRD, cost estimates and other critical documents for essentially every aspect of healthcare delivery (including ancillary services such as marketing and customer service).

36. In combination with the extensive Category 3 work they already provide for TMIP and the National Quality Management Program (NQMP) support contract, this constitutes a virtual monopoly over nearly every IM/IT operation with which the MHS engages—*essentially from the original concept design!*

37. The precedent for this award may result in serious, unintended consequences for the relationships between HA/TMA and their numerous contract partners. Most firms base their strategic and annual business plans on the types of contracts and projects for which they assess they can reasonably and feasibly compete.

38. In at least one example that Axiom is familiar with, a company recently divested more than 20 FTEs that supported TMA's IMT&R Directorate in Category 2 work in order to render themselves eligible to bid on building systems for the MHS. This decision was driven by the specified and implied intent of TMA that the firm needed to make a choice between pursuing either Category 2 or Category 3 work. This decision significantly altered the firm's mission, business plans, organizational structure, and staffing.

39. If a Category 3 firm is permitted to provide Category 2 program management support to an office that maintains oversight for billions of dollars in defense health contract awards, then future advisories on OCI in all HA/TMA SOWs will not be expected by firms to be reinforced, and they will not be considered to have merit.

**(2) <u>The Awardee will Have Inappropriate Access to Program Information</u>**

40. In addition to the oversight of the multi-billion dollar expenditures for purchased care services and T-3, TAD also has a daily responsible for continuous updates on promulgating TRICARE policy, operations, procedures, concepts of operations, and contract modifications that govern every aspect of healthcare delivery in both military treatment facilities and the civilian network of providers. The Enterprise-Wide Referrals and Authorization System ("EWRAS"), is one illustration of performance improvement processes that require the assistance of TAD contractor support.

41. EWRAS was chartered in 2004 to correct a deficiency in the T-NEX contract. In essence, the government was responsible, under terms of the T-NEX contract, to deliver an information system capable of sending bi-directional HIPAA-compliant transactions between all military treatment facilities ("MTFs") and the MCSCs to facilitate referrals for specialty care. In the most advanced stage envisioned, the Enterprise-Wide Referrals and Authorization Systems Module ("EWRAM") must be able to electronically coordinate referrals in compliance with HIPAA regulations, transmit the consult reports following a patient visit, and then archive these reports for future reference.

42. With this charter, the EWRAS Integrated Project Team ("IPT"), and the TMA Information Management, Technology and Reengineering ("IMT&R") Directorate has endeavored for nearly 2 years to develop system requirements that have mapped, in exquisite detail, every step necessary to build the EWRAM.

43. It is widely recognized that the senior leadership within the MHS expects to correct the current deficiencies in EWRAS prior to the next award of TRICARE MCSC contracts (T-3). The EWRAM is currently being reviewed and programmed for implementation beginning in FY08. Estimates suggest that the module will take almost 30 months to build, and several millions of dollars are being programmed for funding the project.

44. The information system flow diagram for the EWRAM was developed in close coordination with TAD personnel, both government and the Axiom contract team, to ensure the system requirements were in alignment with the business processes envisioned for the MHS and to ensure that the necessary contract modifications were crafted for the TRICARE Policy and Operations Manuals.

45. The rough order of magnitude ("ROM") for building EWRAM was derived by subject matter experts comprising the IPT, and refined throughout the staffing process in full view of TMA TAD personnel—both government and contractor. These cost estimates were communicated with all the members of the IPT and the extended staff in TMA for inclusion in Defense Health Program budget.

46. Access by a Category 3 firm from within the TMA TAD, at any point in the EWRAM business process and system mapping development, would clearly constitute an organizational conflict of interest and an unfair competitive advantage over any other firm with an interest towards IM/IT or software product development for this purpose.

47. While is it necessary and appropriate to sustain Category 2 contract support to assist in processes such as those described in the EWRAS example, these contractors must act as an extension to government. Subsequently, they are often included in "government only" meetings as specific program requirements are discussed. In the EWRAS IPT, even chartered members who represented the MCSCs were excluded in the specific details associated with MHS plans on building the project due to business opportunities that could potentially be exploited. Without these precautions, subsequent contracting activities may severely damage the ability of the government to pursue best value in a competitive market.

48. LMIT/LMFH would have an immediate interest in the product development of EWRAM and other similar programs that are meant to provide electronic solutions that can enhance T-3 or other purchased care business processes.

49. While there are clear OCI implications that are immediately apparent within the TMA TAD, we would caution that the EWRAS program is one example, but illustrative of other potential OCI consequences that can affect every other TMA directorate. By becoming directly

involved in the business process requirements and the algorithms for module development, LMIT/LMFH would have immediate access to the architectural design, operational and system views, processes and estimated project costs of EWRAM long before the project is solicited by the government for Category 3 contract support.

**(3) <u>The Awardee will Have Unequal Access to Non-Public Information</u>**

50. EWRAM represents one of dozens of major MHS program initiatives that are immediately hinged to information system solutions and, consequently, represent existing OCI for LMIT/LMFH and their other business interests associated with software development and enterprise-wide IT solutions.

51. The contracting support in the TMA TAD for Program Requirements, Purchased Care Systems Branch, and Contract Operations all have immediate access to the fundamental requirements that are used to design MHS information systems. For example:

a. *TRICARE Encounter Data ("TED").* The transmission of TED from the MCSC, as part of their claims processing responsibility, has experienced historical problems. The TMA TAD is currently reviewing these problems to improve efficiencies in capturing clinical data on patient visits. The expectation is to develop an improved process that will complement operations envisioned for T-3, and to institute information system solutions that will accommodate the process.

b. *TRICARE Information Center ("TIC").* The Purchased Care Systems Branch and Program Requirements Office have been working closely with the TRICARE Operations Directorate to organize and establish a TIC. The TIC is envisioned as an office that can provide sustained functional support for MTF end-users of AHLTA and legacy Composite Health Care

Systems (CHCS) II, as an essential requirement for successful business operations. During the implementation of Primary Care Manager By Name (PCMBN) for the Direct Care System, it became clear that MTF end-users, in large measure, did not possess a clear understanding of CHCS data or how AHLTA operates. TMA office staff has provided significant assistance to end-users, on an ad hoc basis, to:

- correct CHCS data, such as PCM File and Table data;
- instruct and provide impromptu training on how CHCS interfaces with other systems such as DEERS;
- explain the roles of the various organizations involved with assigning PCMs (e.g., MTFs, Managed Care Support Contractors (MCSCs) and DMDC).

52. As our health information systems within the MTFs have become increasingly integrated with Purchased Care Systems and other government systems such as DEERS, the interfaces have also become increasingly complex. MTF end-users require a higher level of competence to run the applications necessary to accomplish daily business, and to keep pace with the associated business processes and practices as the MHS becomes a more performance-based organization.

53. The requirements described above were developed in close coordination with TAD personnel—both government and contractor—to develop a SOW that could be used to solicit contractor support of the TIC. This work is still under consideration by TMA leadership and remains a performance gap that has been recognized by the Purchased Care Systems Branch.

54. Ostensibly, this contract support would be considered Category 3. In any event, it represents an opportunity of clear interest to LMIT/LMFH given their current qualifications and performance relevant to TMIP, and it represents an immediate OCI if this issue continues to be facilitated within the TAD as one of their numerous program initiatives.

55. This particular issue demonstrates that LMIT/LMFH's current contractor support in the TMA TAD not only creates an internal OCI, but it effectively inhibits cross-coordination between other TMA staff directorates. If the risk for sharing of nonpublic information exists with Category 3 contractors on the TAD staff, whether it is real or perceived by the other directorates, they may want to avoid any assertions of unfair competitive advantage. Consequently, other TMA directorates may be constrained in partnering or coordinating with the TAD on operational issues due to their Category 3 support staff and the possibility of OCI created by their association in this process.

56. Sustaining efficient operations for assigning Primary Care Managers to beneficiaries is a specific concern in shaping the T-3 contracts, and a daily operational responsibility for divisions within the TMA TAD. Automated systems are necessary to ensure enrollments and PCM assignments are handled efficiently by the MHS and that corporate visibility of these assignments is available, real-time, for providers and administrators. Information system enhancements are regularly envisioned by program managers for this purpose and may require significant updates under the rubric of T-3 innovations.

57. These aforementioned examples represent just a brief sampling of the information system solutions for which the TMA TAD has substantive management and requirements responsibility. Many of these solutions begin with business process requirements that create the template for data systems, and these envisioned data systems evolve as major acquisition programs.

58. A Category 3 contracting firm within the TMA TAD, who is intimately involved with the development of these requirements would, inappropriately, have immediate access to the planning documents that forecast health IM/IT systems. Further, it is not unreasonable to expect

that they would have privileged access to existing acquisition program efforts within the MHS architecture (e.g., Enterprise-Wide Scheduling-Registration, TRICARE On-line, the Patient Accounting System, and Enterprise Workload Forecasting). This access not only allows them a favored competitive advantage on new initiatives, but on future work relevant to these existing projects.

**(4) <u>LMIT/LMFH's OCI based upon ACAT-I Support of TMIP</u>**

59. Coordination between program managers within the TMA IMT&R Directorate and the TAD is necessary and appropriate to align information system and business process designs, and to collate the inputs of all stakeholders.

60. However, when the acquisition support is provided by a contracting firm who is widely recognized within the Department of Defense for its work on Major Defense Acquisition Programs ("MDAP"), including Acquisition Category I ("ACAT-I") information system development, it creates a conflict of interest that cannot be resolved through mitigation plans.

61. It is difficult for LMIT/LMFH to minimize their Category 3 status—even within the specific context of the MHS—given their substantive and central contributions to the Theater Medical Information Program ("TMIP"). LMIT/LMFH supports the product development of TMIP. TMIP is an ACAT-I MDAP, which is the highest classification for acquisition programs within the Department of Defense. It is the same classification reserved for major weapon systems development.

62. An MDAP is estimated by the Secretary of Defense to require an eventual total expenditure for research, development, test, and evaluation of more than $365 million (updated

to FY 2000 constant dollars) or an eventual total expenditure for procurement of more than $2.19 billion (updated to FY 2000 constant dollars).

63. TMIP is essentially the information system backbone for all medical operations functions for deployed forces, but its project design is to create a seamless interface with all clinical, logistics, resourcing and enterprise-wide decision support databases. In addition, LMIT/LMFH was also recently responsible for Category 3 work for the Executive Information/Decision Support Purchase Care Operations. This work was focused upon developing the MHS Mart (M2) as the core user's tool for obtaining clinical, beneficiary population, enrollment, costing and workload data.

64. LMIT/LMFH's current responsibilities for the TMIP mission (including, but not limited to, system engineering and analysis, design and development of TMIP components, integrated testing, and sustainment) touch virtually every supporting system application within the MHS architecture.

65. TMIP's objective, in fact, is to integrate all existing peacetime systems to link every level of care—from the front edge of the battlefield to the brick-and-mortar medical centers in the continental United States. By providing them access to Category 2 requirements development in the TAD, this contract award essentially gives them a comprehensive view of all CONOPS, SOWs, functional requirements development, and cost estimates for virtually every task conceivable for healthcare delivery in the MHS.

66. By working within the TAD, LMIT/LMFH is now given unequal access to nonpublic information that further informs their affiliates who are extensively involved in Category 3 product development and services. LMIT/LMFH, in its work for the TRICARE Purchased Care Data Operations and Functional Support, is a supplier of Category 2 support for TRICARE in the

Purchased Care System Branch. Therefore, their staff may now be placed in positions that assist TRICARE in planning and managing its activities and purchased care systems development programs like new TEDs and DMDC applications, NPI, and systems that interact with CHCS/AHLTA programs.

67. In the course of supporting the Purchased Care Systems Branch and TMA's Program Requirements Office, LMIT/LMFH contractors in the TAD will be in a position to interact with the procurement, evaluation and acceptance of products produced by LMIT/LMFH staff working on TMIP software. This is precisely the situation that the system of contractor categories is designed to prevent. Their position effectively positions them to obtain inside knowledge to supply Category 3 affiliates with unequal access to nonpublic information.

**(5) Adverse Effect on Industry Forums Created by Perceived OCI**

68. LMIT/LMFH's direct participation in crafting requirements for T-3, as well as other daily operations, provides them with knowledge and access that clearly signals the absence of impartiality for subsequent competition in development of MHS data systems.

69. The contracted program management support provided to the TMA TAD is expected to become an extension of the government and to become fundamentally involved in crafting statements of work, orchestrating industry forums, clarifying questions of potential bidders on requests for proposals, and assisting in responding to protests.

70. LMIT/LMFH's involvement in any of these important functions will likely dissuade competition from reputable companies on important programs, and invites controversy and the increased potential for protests in the wake of award decisions.

71. Industry forums that are organized by LMIT/LMFH for the TMA TAD will be severely disadvantaged. Other Category 3 firms who would otherwise want to share the capabilities they can offer to the MHS, as well as concepts for improving their operations, will not risk divulging proprietary information.

72. Having LMIT/LMFH involved in T-3 program management activities will almost certainly have a chilling effect on the sharing of ideas from potential MCSCs, pharmacy benefit contractors, dental contractors, and United States Federal Health Plan participants.

73. Potential contract partners that can provide purchased care services will fear that a company of LMIT/LMFH's magnitude and breadth of services may be able to use information from these forums to further their various business enterprises and causes. As an example, in the previous T-NEX bids, one MCSC proposed a capability to conduct their own claims processing rather than sub-contract to an independent fiscal intermediary.

74. It is reasonable to expect that other organizations may propose similar unique selling propositions in responding to T-3 solicitations. In the presence of a Category 3 firm, a potential MCSC may be reluctant to share specific details of how they might accomplish similar tasks since it essentially provides the blueprint of their concepts to a potential competitor.

**Count I**

(Violation of Terms of the RFP and 48 CFR Sub-Part 9.5 )

75. Plaintiff incorporates by reference the allegations presented in paragraphs 1 to 64 above.

76. The RFQ discussed the nature of the organization for which the services were to be provided and the potential of OCI's on the part of the offerors. The RFQ further stated that the

organization generally sought support in three areas identified as Categories 1-3. The work under the solicitation fell within Category 2 contract work, which meant that Offerors performing either Category 1 or 3 contract work for TMA were subject to an OCI. Axiom performs only Category 2 work for TMA.

77. Conversely, LMFH currently provides system programming services under RFQ No. 93659 for the TRICARE Encounter Data process ("TED"), which is a Category 3 contract for the TRICARE organization, HPA&E. Furthermore, the record indicates that LMFH currently performs 18 contracts classified as Category 3 with a total contract value of $114,595,000.

78. Although the contracting officer has recognized that some sort of OCI exists, he did not fully appreciate the nature of the conflict and his reliance on the LMFH mitigation plan is misplaced.

79. Plaintiff respectfully requests that the Court issue an order immediately enjoining the Government from taking the actions described above or in the alternative enjoining the Army from employing the funds obligated to the performance of a contract to provide the services required under Request for Quotations No. 154160 (under Contract No. GS-10F-0065N) of any contract awarded to LMFH, LMIT, or any entity other than the Plaintiff for these services. Axiom also respectfully requests that the Court grant Plaintiff its attorney's fees and its costs in bringing this action.

**Count II**

(The Army's Violation of its Implied Duty of Good Faith and Fair Dealing)

80. Plaintiff incorporates by reference the allegations presented in paragraphs 1 to 79 above.

81. By its arbitrary and capricious decision to ignore the clear conflicts of interest in the award of the present contract to LMFH, the Army has breached its duty of good faith and fair dealing it owed to Axiom as an offer under the procurement.

82. Based on these circumstances the Army's actions are not justified and the Plaintiff's protest should be sustained.

83. Plaintiff respectfully requests that the Court issue an order immediately enjoining the Government from taking the actions described above or in the alternative enjoining the Army from employing the funds obligated to the performance of a contract to provide the services required under Request for Quotations No. 154160 (under Contract No. GS-10F-0065N) of any contract awarded to LMFH, LMIT, or any entity other than the Plaintiff for these services. Axiom also respectfully requests that the Court grant Plaintiff its attorney's fees and its costs in bringing this action.

**<u>Relief Requested</u>**

**WHEREFORE** Plaintiff respectfully requests a judgment against the United States of America and further requests:

1. That the Court enjoin the Army from permitting performance of any contract under Request for Quotations No. 154160.

2. Or in the alternative enjoining the Army from employing the funds obligated to the performance of any contract awarded to LMFH, LMIT, or any entity other than Axiom for the services sought under the RFQ.

3. That in any event Axiom be awarded its reasonable costs and attorneys' fees, and such further relief as is determined just and fair.

Respectfully submitted,

Date: July 16, 2007

By: ______________________________

James S. DelSordo, Esq.
Argus Legal, LLC
9255 Center St.
Suite 307
Manassas, VA 20110
(703) 368-8770
fax (703) 368-8772

Counsel for Plaintiff Axiom Resource Management, Inc.