# In the United States Court of Federal Claims

No. 07-532C
Filed: September 28, 2007
**TO BE PUBLISHED***

| | |
|---|---|
| AXIOM RESOURCE MANAGEMENT, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Administrative Procedure Act, 5 U.S.C. § 706; Bid Protest; Mitigation; Organizational Conflicts of Interest, 48 C.F.R. § 9.5; Permanent Injunction; Public Interest; Standing; Supplementation of the Administrative Record; Technical Evaluation; Tucker Act, 28 U.S.C. § 1491(b)(4). |

**James S. DelSordo**, Argus Legal, LLC, Manassas, Virginia, Counsel for Plaintiff.

**William G. Kanellis**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**LTC James A. Lewis**, United States Army Legal Services Agency, Arlington, Virginia, Of Counsel.

## MEMORANDUM OPINION AND ORDER

**BRADEN, *Judge*.**

The federal government's increased use of and dependence on outside contractors to perform essential government functions,[1] often entails providing these contractors with governmental,

---

[*] On September 21, 2007, a pre-publication draft of this Memorandum Opinion and Order was provided to the parties under seal, with instructions to propose any redactions on or before September 27, 2007. On September 28, 2007, this Memorandum Opinion and Order was published with redactions, indicated by the designation "[deleted]." The non-redacted version was also filed on September 28, 2007 under seal with the Clerk of the United States Court of Federal Claims.

[1] *See, e.g.*, *The Diane Rehm Show: Government Contractors* (American University Radio WAMU 88.5 FM, Washington, D.C., May 9, 2007) (TR at 5) ("[P]rivate sector contractors are playing an increasingly larger role in our federal government. Outsourced work has almost doubled . . . from about $207 billion in 2000 to about $400 billion in 2006."); *see also* August Cole,

business proprietary, and otherwise private information to perform their duties. This has increased potential and actual conflicts of interest regarding how, and the extent to which, such information is utilized in performing contract services and otherwise. *See* Ralph C. Nash, *Organizational Conflicts of Interest: An Increasing Problem*, 20 No. 5 NASH & CIBINIC REPORT ¶ 24 (May 2006). Establishing the parameters of access to and use of this information will be among the most important decisions that the United States Court of Federal Claims and the United States Court of Appeals for the Federal Circuit will make in the next few years – not only for government contract jurisprudence, but to maintain competition in this growing segment of the economy.

The procurement at issue is an example of this trend – in this agency: contract personnel outnumber federal employees 4 to 1; multiple firms provide management and product support services; and hundreds of millions of dollars are spent for outside contractors to perform these services. *See* Richards Decl. ¶ 8 at 4 (AR 929). This case presents the court with the issue of when a potential organizational conflict of interest is identified, whether the procuring agency's mitigation plan meets the requirements of the Federal Acquisition Regulation ("FAR") § 9.504(e), 48 C.F.R. § 9504(e), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and how the court should determine whether the proposed mitigation ameliorates the identified conflict. As a leading scholar and commentator in government contracts has observed, FAR § 9.504(e) provides the Contracting Officer with no specific guidance about "what type of solicitation restraints are appropriate[.] Basically, COs are left to figure it out for themselves." Ralph C. Nash, *Conflicts of Interest: The Guidance in the FAR*, 15 No. 1 NASH & CIBINIC REPORT ¶ 5 (Jan. 2001).

To facilitate an analysis of the Memorandum Opinion and Order, the court provides the following outline:


**I. FACTUAL BACKGROUND.**

**A. The TRICARE Acquisitions Directorate.**

**B. The July 30, 2006 Request For Quotation No. 154160 For Program Management Support Services For The TRICARE Acquisitions Directorate.**

**C. The Competing Parties' Proposals For Request For Quotation No. 154160.**

**1. Regarding Technical Evaluations.**

**2. Regarding Past Performance Evaluations.**

**3. Regarding Price And Overall Performance Evaluations.**


---

*Lockheed Looks Beyond Weapons: Contractor Targets Growth With Services in Strife-Torn Areas*, WALL ST. J., Sept. 24, 2007, at A10 (chart reporting: that the Department of Defense authorized $1.6 billion for outside medical service contracts in fiscal year 1996; and authorized $8 billion in such contracts in fiscal year 2005–a 412% increase from 1996).

**D. The September 25, 2006 Bid Protest At The Government Accountability Office.**

**E. The December 7, 2006 Bid Protest At The Government Accountability Office.**

**F. The April 3, 2007 Bid Protest At The Government Accountability Office.**

**II. PROCEDURAL HISTORY IN THE UNITED STATES COURT OF FEDERAL CLAIMS.**

**III. DISCUSSION.**

**A. Jurisdiction.**

**B. Standing.**

**C. The Relevant Standards For Decision On The Administrative Record In A Bid Protest Case.**

**D. The Parties' Cross-Motions For Judgment On The Administrative Record.**

**1. The Contracting Officer's Evaluation Of The Competing Parties' Technical Approach and Past Performance Ratings.**

**a. The Plaintiff's Arguments.**
**b. The Government's Response.**
**c. The Court's Resolution.**

**2. The Contracting Officer's Exercise Of Discretion Regarding Potential Organizational Conflicts Of Interest.**

**a. The Plaintiff's Arguments.**
**b. The Government's Response.**
**c. The Court's Resolution.**

**i. The Federal Acquisition Regulation Requirements Regarding Organizational Conflicts of Interest.**
**ii. The Contracting Officer Initially Failed, But Later, Identified And Analyzed One Potential Organizational Conflict Of Interest.**
**iii. The Contracting Officer Did Not Exercise Sound Judgment In Developing An Appropriate Mitigation Plan.**

**IV. CONCLUSION.**

# I. FACTUAL BACKGROUND.[1]

## A. The TRICARE Acquisitions Directorate.

TRICARE is the United States Department of Defense's health care program for active and retired members of the Armed Services, their families, and survivors. *See* 32 C.F.R. § 199.17 (2006).[2] The TRICARE Management Activity ("TMA") was established to manage these programs. *See* 32 C.F.R. § 199.17 (2006); *see also* Richards Decl. ¶ 7 at 3 (AR 928). TMA is responsible for the policy, management, and budget of TRICARE programs, including "purchased healthcare, provided by TRICARE contractors" and "non-purchased" healthcare, provided by the Military Health System's network of military hospitals and clinics. *See* Richards Decl. ¶¶ 5-7 at 3-4 (AR 928-29).

On July 30, 2006, the United States Army Medical Research Acquisition Activity, (hereinafter "the Army" or "the Government") issued a Request For Quotation No. 154160 ("RFQ") for program management support services for the TRICARE Acquisitions Directorate ("TAD"), including support to the TRICARE Office of General Counsel and the TRICARE next generation of managed care support procurements ("T-3"). *See* AR 1-4.

---

[1] The facts recited herein primarily were derived from: the April 17, 2007 Administrative Record and Supplements thereto ("AR 1-978"); Plaintiff's July 25, 2007 Statement of Facts ("Pl. PF"); and the Government's August 3, 2007 Counterstatement of Facts ("Gov't PF").

[2] Pursuant to the Department of Defense Appropriation Act for Fiscal Year 1994, Public Law 103-139 § 8025 (Nov. 11, 1993), TRICARE was established to operate the Military Health Service, and has:

> evolved into a partnering structure that is unique [to] both Government and civilian healthcare sectors. This is a point that cannot be stressed enough. Because it is this partnering that cause[s] changes in the purchase care system to have a direct impact on non-purchase care information systems. To manage this actively the TRICARE Management Agency (TMA) was established. TMA is responsible for the policy, management and budgeting of the TRICARE program, to include both purchase health care, provided by the TRICARE contractors, and the non-purchase health care, provided in the MTFs.

Richards Decl. ¶¶ 6-7 at 3-4 (AR 928-29).

**B. The July 30, 2006 Request For Quotation No. 154160 For Program Management Support Services For The TRICARE Acquisitions Directorate.**

The July 30, 2006 Request For Quotation No. 154160 ("RFQ") at issue in this case advised potential bidders that:

> This award provides for program management support services to the TRICARE Acquisitions Directorate (TAD) to operationalize the TRICARE program. Services provided by the Contractor shall include supporting Integrated Project Teams and Working Integrated Project Teams, maintaining project milestone charts, and preparing documentation as necessary. Program activities supported shall include, but are not necessarily limited to, Claims Processing, HIPAA [Health Insurance Portability and Accountability Act] compliance, DEERS [Defense Enrollment Eligibility and Reporting System] and TEDS [TRICARE Encounter Data System] support, General Counsel administrative support, as well as support for the T-3 suite of contracts.

AR 4.

To identify, avoid, or mitigate any Organizational Conflicts of Interest ("OCIs"), TMA categorized all "non-purchased care"[3] requirements relating to the RFQ into broad categories "in accordance with FAR Subpart 9.5:"

- Category 1: TMA Internal Support: Services which, by their very nature, give the Contractor access to extensive data about the contracts of all other TMA contractors.

- Category 2: Program Management Support: Services which assist TMA in planning and managing its activities and programs. This includes, for example: requirements analysis, acquisition support, budget planning and management, business process reengineering,

[3] According to the Army, "non-purchased care" requirements are for support services, such as information technology infrastructure, and "purchased care" requirements are for actual health care services. *See* Gov't PF ¶¶ 4-6; *but see* Richards Decl. ¶ 12 at 6 (AR 931) ("[b]y the very nature [of] the interdependency between the purchased care and non-purchased care elements of the TRICARE program[,] any change to TRICARE will most likely effect a change in either a TMA or non-purchase care information system, [t]hereby giving contract personnel working on this effort access to non-purchase care requirements."); *see also* Adams Decl. ¶ 11 at 4 (AR 921) ("[W]hat I cannot comprehend is how you identify information that is specific and relevant only to purchased care from non-purchased care services, a central component of Lockheed [Martin]'s plan.").

program planning and execution support, and independent technical management support.

- Category 3: Product Support: Services or end items required to meet the mission requirements of TMA's non-purchased care activities and programs. This includes, for example: concept exploration and development; system design; system development and integration; COTS procurement and integration; internal development testing; deployment; installation; operations; and maintenance.

Contractor participation in more than one of these areas may give rise to an unfair competitive advantage resulting from access to advance acquisition planning, source selection sensitive or proprietary information. Furthermore, contractor participation in more than one area may give rise to a real or apparent loss of contractor impartiality and objectivity where its advisory or planning assistance in one area potentially affects its present or future participation in another area.

The purpose of this categorization is to accomplish the following three objectives: (1) to inform prospective Offerors that TMA presumes that award of a contract or order in the subject category will give rise to real or apparent OCIs with respect to the requirements in the other two categories; (2) to assist current contractors and prospective Offerors in developing their own business strategies regarding participation in TMA requirements and in identifying and, where possible, avoiding or mitigating against OCIs; and (3) to ensure that all current contractors and prospective Offerors are afforded maximum practicable opportunity to compete for all TMA requirements consistent with the restrictions required under FAR Subpart 9.5 and sound business practices.

AR 5; *see also* Richards Decl. ¶¶ 9-11 at 4-5 (AR 929-30).

The RFQ also provided that a "single-category" offeror intending to submit an offer in a different category, or any offeror currently or previously providing support in more than one category, must:

Perform a comparative analysis of the potential new work against *all* current and previous work performed in support of TMA *in any category other than that of the new work being offered*. The comparative analysis must be included in the proposal for the new work, and must include a statement certifying whether the contractor believes that its performance of the proposed new work would create a real or apparent OCI. If the contractor believes that no real or perceived OCI will result from an award of the proposed work, no additional action by the contractor is required.

> If the Offeror/Contractor believes that a real or apparent OCI may exist as a result of an award, the contractor shall also submit an OCI Avoidance or Mitigation Plan with its proposal.

AR 20 (emphasis in original).

Anticipating that TAD may have increased support needs in the future, the RFQ requested a five year cost-estimate based on current needs ("Base Period"), as well as an estimate of costs should TAD need additional support ("Optional Period"). *See* AR 12-13.

The RFQ also stated the award would be based on an evaluation of both cost and non-cost/price factors. *See* AR 23. Non-cost/price factors were determined to be significantly more important:

> Evaluation criteria are numbered in descending order of importance: (1) Technical Approach, (2) Experience, (3) Quality Control Approach, (4) Past Performance, and (5) Price/Cost. All evaluation factors other than cost or price, when combined are significantly more important that [sic] cost or price.

*Id*. Non-cost/price factors were to be evaluated on a five point scale, *i.e.*, from best to worst, proposals could be rated as "Exceptional," "Good," "Acceptable," "Marginal," or "Unacceptable." AR 369.

In addition, the RFQ made clear that pre-award discussions between the contracting officer ("CO") and offerors would not occur, unless the CO requested them: "The Government intends to award a task order without discussions. Offerors should provide their best, complete proposal upon initial submission. The Government reserves the right to hold discussions if deemed necessary by the [CO]." AR 2.

### C. The Competing Parties' Proposals For Request For Quotation No. 154160.

The July 30, 2006 RFQ was for Category 2: Program Management Support. *See* AR 4-5. On August 14, 2006, Plaintiff and Lockheed Martin Federal Health Insurance, Inc., a wholly-owned subsidiary of Lockheed Martin Corporation (hereinafter referred to as "Lockheed Martin"), submitted proposals. *See* AR at 29, 209. Lockheed Martin's proposal also included an OCI Mitigation Plan and Comparative Analysis, a Lockheed Martin Corporate Policy Statement for OCI, a List of Lockheed Martin Activities Supporting TMA, and a Summary of Key Personnel Qualifications, Resumes, and Letters of Intent. *See* AR at 60-102.

#### 1. Regarding Technical Evaluations.

The Technical Approach was to be evaluated, based upon:

> The degree to which the Offeror's technical approach (including approach to staffing) reflects a clear understanding of the tasks outlined in the PBSOW [Performance

> Based Statement of Work] and a reasonable, well-thought-out approach that is likely to yield the required results within the required time frame.

AR 23.

The Technical Evaluation was conducted and completed by Evaluator 1 on September 7, 2006 and Evaluator 2 on September 6, 2006. *Id*. 377, 387. The following are the consensus ratings of the Technical Evaluation Panel:

| **Evaluation Factor** | **Lockheed** | **Plaintiff** |
|---|---|---|
| Technical Approach | Exceptional[4] | Acceptable[5] |
| Experience | Exceptional | Exceptional |
| Quality Control Approach | Exceptional | Exceptional |
| Past Performance | Acceptable | Good[6] |
| OVERALL RATING | EXCEPTIONAL | GOOD |

AR 421.

---

[4] An "exceptional" rating is accorded where:

> [A] proposal contains significant strengths and no weaknesses. The proposal exceeds the performance and technical capability requirement defined in the SOW [Statement of Work]. The proposal offers value-added methodologies for improving service that benefits the Government. The evaluator has no doubt that the offeror can successfully achieve the requirements in the SOW if the technical approach proposed is followed. The offeror acknowledges risks and develops an approach that proactively identifies and mitigates risks, and looks to reduce or eliminate future risks.

AR 369, 396.

[5] An "acceptable" rating is accorded where:

> [A] proposal contains strengths that outweigh any existing weaknesses. The offeror's proposal meets the performance and technical capability requirements defined in the SOW. The evaluator is confident that the offeror can successfully achieve the requirements in the SOW if the technical approach proposed is followed.

AR 369, 396.

[6] A "good" rating is accorded where:

> A . . . proposal contains significant strengths, and only a few minor weaknesses. The offeror's proposal meets the performance and technical capability requirements as defined in the SOW. The evaluator has a high degree of confidence that the offeror can successfully achieve the requirements in the SOW if the technical approach proposed is followed. The offeror acknowledges technical or schedule risk and develops an approach capable of mitigating all apparent risks effectively.

AR 369, 396.

In rating Lockheed Martin's Technical Approach as "Exceptional," Evaluator 1 [deleted].

In contrast, Evaluator 1 rated Plaintiff's Technical Approach as "Acceptable," although finding [deleted]. *See* AR 406.

**2. Regarding Past Performance Evaluations.**

Past Performance was to be evaluated based upon:

> The degree to which past performance evaluations either included in the proposal or identified by the evaluators in any other manner, reflect success in the Tasks outlined in the PBSOW Section 2.2 and the degree to which these evaluations of past performance reflect a management approach that encourages customer satisfaction and collaboration. The offeror must provide a list of at least 3 but no more than 5, references of relevant past and present contracts for Federal, State and/or City agencies and commercial customers within the past 3 years. "Relevant" is defined as like service as stated in this solicitation's Statement of Work in terms of similar scope and complexity.
>
> * * *
>
> The Goverment may also consider information obtained through other sources. Past performance will be utilized to determine the quality of the contractor's past performance as it relates to the probability of success of the required effort.

AR 24.

Evaluator 1 rated Lockheed Martin's Past Performance as "Acceptable," but did not list any outside references contacted. *See* AR 376. Evaluator 2 also rated Lockheed Martin's Past Performance as "Acceptable," contacting two references. *See* AR 386. In rating Plaintiff's Past Performance as "Good," however, Evaluator 1 did not list any of Plaintiff's references contacted. *See* AR 402. Evaluator 2 rated Plaintiff's Past Performance as "Exceptional," based on two references contacted. AR 411.[7] A third reference, the CO's Representative ("COR") for Plaintiff's incumbent requirement, decided that he could not provide any information on Plaintiff's Past Performance, because his wife was affiliated with a Lockheed Martin subsidiary. *See* AR 965. In the September 19, 2006 Award Memorandum, the CO indicated that both of the references contacted on Plaintiff's behalf provided a "Good" rating. *See* AR 467. Both of Lockheed Martin's contacted references, however, stated that Past Performance was "Acceptable." AR 467.

[7] This rating, however, was not recorded in the final overall summary of Evaluator 2's evaluation of Plaintiff's Past Performance. *See* AR 412. Instead, the final evaluation reflects Plaintiff's Past Performance as only "Good." *Id*.

The CO's subsequent December 6, 2006 Award Memorandum provided a more thorough explanation of the Past Performance ratings:

> **FACTOR #4 -- PAST PERFORMANCE**
>
> **Axiom- Good -** Two references were contacted and provided feedback. One of the references was very pleased with Axiom stating their performance was "outstanding" and "very positive." "Great people with the right skills, in place at or ahead of schedule." The second reference only provided "yes" answers.
>
> **[Lockheed Martin]- Acceptable** - Two references were contacted and provided feedback. One of the references stated they were overall satisfied with [Lockheed Martin]. [Lockheed Martin] was very attentive to delivering what is in the contract. There were some examples where they were slightly less than satisfied. The second reference provided "yes" answers.

AR 534; *see also* AR 377-87.

**3. Regarding Price And Overall Performance Evaluations.**

Lockheed Martin's proposal estimated that the three year base period was [deleted], with an optional period estimated at [deleted], or a total cost of $20,212,794.20. *See* AR 173. Both Evaluators gave Lockheed Martin's proposal an Overall rating of "Exceptional," with an "Exceptional" rating on all but one non-cost/price factor. *See* AR 377, 387.

Plaintiff's proposal estimated that the three year base period would cost [deleted] with an optional period estimated at [deleted], or a total cost of $24,016,635.00. *See* AR 354-56. Both Evaluators gave Plaintiff's proposal an Overall rating of "Good," with a "Good" rating for Past Performance; an "Exceptional" rating for Experience and Quality Control Approach; and an "Acceptable" rating for Technical Approach. *See* AR 403, 412.

On September 11, 2006, however, the CO requested that both of the competing proposals be amended to cover three years, instead of five. *See* AR 428-32. Plaintiff's amended proposal estimated that the shorter base period would cost [deleted], and the optional period would cost [deleted], or a total of $12,766,815. *See* AR 451-53. Lockheed Martin's proposal estimated that the shorter base period would cost [deleted], and that the optional period would be [deleted], or a total cost of $11,882,504.80. *See* AR 443.[8]

On September 19, 2006, the CO recommended awarding the Task Order to Lockheed Martin, because it had the highest overall rated proposal, at the lowest price. *See* AR 469.

---

[8] The CO, however, considered both proposals to be inaccurate, because travel costs were "overstated" in Plaintiff's proposal and "understated" in Lockheed Martin's proposal. *See* AR 468.

### D. The September 25, 2006 Bid Protest At The Government Accountability Office.

On September 25, 2006, Plaintiff filed a bid protest with the Government Accountability Office ("GAO") alleging that Plaintiff's Technical Approach and Past Performance ratings improperly were evaluated and Lockheed Martin could not be awarded the contract, because Lockheed Martin had an unmitigatable conflict of interest ("OCI"). *See* AR 498. In response, the CO issued a Stop Work Order on September 28, 2006. *See* AR 514. On October 25, 2006, the CO promised to evaluate the alleged OCI and issue a new Source Selection Decision. *See* AR 516. In light of this proposed corrective action, on October 31, 2006, the GAO dismissed the bid protest over Plaintiff's objection. *See* Pl. PF ¶ 13. On November 1, 2006, the Army's Technical Evaluation Panel issued a new Consensus Report, with the same ratings as the prior evaluation. *See* AR 517-25.

On November 30, 2006, the TMA conducted an Organizational Conflict of Interest Assessment, finding that a potential "unequal access to information" OCI existed:

> The contractor will have access to Procurement Sensitive Information (PSI) such as drafts RFPs, acquisition timelines, IGCEs, legal opinions, etc. They will also be exposed to proprietary information relating to current contractors and potential bidders. It would create an OCI if this contractor were to offer on any acquisitions for *purchased care services* managed by the TRICARE Management Activity, including managed care, TFL, dental, retail pharmacy, mail order pharmacy, foreign claims processing, auditing, and quality monitoring.

AR 528 (emphasis added).

The CO's December 6, 2006 OCI Analysis concluded that an OCI did not currently exist, but "would exist if [Lockheed Martin] were to offer on any acquisitions for *purchase care services* managed by the TMA." AR 538 (emphasis added). The CO, however, was satisfied that "Lockheed [Martin] has provided a mitigation plan that provides sufficient protection of Government interests to allow award to [Lockheed Martin]." AR 538. Consequently, the Army issued an Award Memorandum, recommending Lockheed Martin and lifted the Stop Work Order. *See* AR 530-36, 41.

### E. The December 7, 2006 Bid Protest At The Government Accountability Office.

On December 7, 2006, Plaintiff was notified that Lockheed Martin was awarded the Task Order and Plaintiff filed a second protest with the GAO. *See* AR 539, 549. Again, Plaintiff alleged that the CO improperly evaluated Plaintiff's Technical Approach rating:

> According to the [CO,] [Plaintiff]'s proposal has no weaknesses . . . . Despite the fact that [Plaintiff]'s proposal has no weaknesses, and [Plaintiff] is currently performing this work and has received exceptional past performance ratings, the Army failed to give the Protester the highest technical grade and downgraded [Plaintiff]'s proposal.

AR 556.

In addition, Plaintiff objected to the CO's Past Performance rating:

> [Plaintiff] submitted four past performance references including one from the COR for the incumbent contract. According to the [CO]'s notice of award to [Lockheed Martin], [Plaintiff] did not receive the highest rating for past performance. . . . In fact all of [Plaintiff]'s references who were contacted by the Government assert that they told the current evaluators that Axiom had provided exceptional service.

AR 557.

Plaintiff also asserted that the CO could not downgrade Plaintiff's proposal, without informing Plaintiff of any perceived deficiencies. *See* AR 558. In addition, Plaintiff asserted that Lockheed Martin's performance of the contract created and perpetuated an OCI:

> The RFQ states that the work under the solicitation fell within Category 2 contract work, which meant that offerors performing either Category 1 and 3 [sic] work for TMA were subject to an OCI.
>
> * * *
>
> [Lockheed Martin] has a contract with TRICARE to provide system programming services meaning that there is an unmitigated OCI. . . . Category 3 organizations, such as Lockheed Martin Information Technology (LMIT) [also a Lockheed Martin subsidiary], by dint of their intimate involvement in the design, development, integration, installation and maintenance of specific end items for the Department of Defense should inherently disqualify them from any activities that place them in position of evaluating or effectively evaluating their own systems and programs.
>
> * * *
>
> LMIT/[Lockheed Martin], under the terms of the current award, would have access to the CONOPS, FRD, cost estimates and other critical documents for essentially every aspect of healthcare delivery (including ancillary services such as marketing and customer service). In combination with the extensive Category 3 work they already provide for TMIP and the National Quality Management Program (NQMP) support contract, this constitutes a virtual monopoly over nearly every IM/IT operation with which the MHS engages–*essentially from the original concept design!*

AR 558-59, 561 (emphasis in original).

On December 8, 2006, the CO issued a second Stop Work Order. *See* AR 577. On January 8, 2007, the CO proposed to take additional corrective action by re-reviewing the alleged OCI and

issuing a new Source Selection Decision. *See* AR 579. Based on these representations, the GAO dismissed the second protest on January 16, 2007. *See* Pl. PF ¶ 19.

On February 15, 2007, TMA issued an OCI Review Information Memorandum, revised on March 28, 2007. *See* AR 580-611. The Revised Memorandum conceded that Lockheed Martin employees would have access to non-public information relating to TRICARE purchased care, but stated they would not have access to non-public information relating to TRICARE non-purchased care. *See* AR 611. Therefore, although a potential OCI existed due to an "unequal access to information" conflict, the TMA decided that the conflict would affect only "purchased care" requirements. *Id.* The revised OCI Review also concluded that this potential conflict was mitigated by TMA and Lockheed Martin "policies" that would exclude all Lockheed Martin entities from bidding on any future "purchased care" requirement contracts. *See* AR 606, 610. In addition, TMA relied on the fact that Lockheed Martin's mitigation plan required its employees to sign non-disclosure agreements to prevent disclosure of non-public information to other Lockheed Martin entities, and to undergo training to identify potential OCIs. *Id.*

Accordingly, on April 2, 2007, the CO issued an OCI Determination finding that:

> based upon the Technical Evaluation Panel (TEP), Lockheed [Martin]'s OCI Mitigation plans and comparative analysis, and TMA and USAMRAA's internal OCI evaluation, [] no OCI exists for non-purchased care requirements. This pertains to all current Category 3 contracts held by Lockheed [Martin], including the TMIP contract being conducted under an approved mitigation plan. Lockheed [Martin] holds no Category 1 work and has asserted they will not perform any Category 1 work. A potential OCI exists for purchased care requirements only. However, it has been determined by the Government that Lockheed [Martin] will be eliminated from future requirements with purchased care requirements.

AR 616.

On April 2, 2007, a Task Order was issued to Lockheed Martin and the prior Stop Work Order was rescinded the next day. *See* AR 617, 626.

### F. The April 3, 2007 Bid Protest At The Government Accountability Office.

On April 3, 2007, Plaintiff filed a third protest with the GAO. *See* AR 634. Again, Plaintiff objected to: the CO's Technical Approach Evaluation; Past Performance Evaluation; the CO's failure to discuss perceived bid shortcomings with Plaintiff; and Lockheed Martin's "ongoing" OCI. *See* AR 648-63. On April 5, 2007, the CO issued a third Stop Work Order. *See* AR 667. On May 21, 2007, Plaintiff supplemented this third protest, with new allegations that the CO did not review all of the documents claimed when he made the prior OCI assessments, and requested copies of the same. *See* AR 899-906.

On July 12, 2007, the GAO again denied Plaintiff's protests, finding that the CO:

> reasonably determined that the issuance of [the] task order . . . did not create an impermissible . . . [OCI] where the agency reviewed both existing and future support requirements, and concluded that no OCI exists for current support contracts, that any potential future OCIs can be mitigated and that the awardee here will be barred from competing as a prime contractor or subcontractor on future support contracts to provide healthcare benefits directly to TRICARE benefit recipients.

*Axiom Resource Management, Inc.*, Comp. Gen. B-298870.3; B-298870.4, July 12, 2007 ("*Axiom Resource Mgmt.*"), at 1, *available at* http://www.gao.gov/decisions/bidpro/2988703.pdf.

The GAO also determined that "the agency reasonably concluded it did not require further information to determine which quotations represented the best value to the government." AR 9. In addition, the GAO concluded that "[g]iven Lockheed [Martin]'s lower price, we have no reason to conclude that [Plaintiff]'s, at best, equally-rated, but higher-priced quotation would have received the award here." AR 10-11.

## II. PROCEDURAL HISTORY IN THE UNITED STATES COURT OF FEDERAL CLAIMS.

On July 17, 2007, Plaintiff filed a Complaint in the United States Court of Federal Claims ("Compl."), together with a Motion for a Temporary Restraining Order, a Motion for a Preliminary Injunction, and a Memorandum in Support. Count I of the Complaint alleges that the Army violated the RFQ and FAR § 9.5, because "[a]lthough the contracting officer has recognized that some sort of OCI exists, he did not fully appreciate the nature of the conflict and his reliance on the [Lockheed Martin] mitigation plan is misplaced." Compl. ¶ 78. Count II alleges that " [b]y its arbitrary and capricious decision to ignore the clear conflicts of interest in the award of the present contract to [Lockheed Martin], the Army has breached its duty of good faith and fair dealing it owed to Axiom as an offeror under the procurement." *Id.* ¶ 81. Incorporated into Counts I and II also are allegations that the Army did not evaluate Plaintiff's proposal in accordance with the RFQ, because Plaintiff's "technical proposal was downgraded to merely Acceptable without any discussions between the Government and [Plaintiff] . . . and [Plaintiff]'s past performance rating was identified as Good; however the contracting officer only contacted two of [Plaintiff]'s four past performance references, and one of the references **NOT** contacted was [Plaintiff]'s reference for its performance of the incumbent contract for the services sought under the RFQ." *Id.* ¶¶ 19-20 (bold in original). The Complaint also requests that the court "enjoin the Army from permitting performance of any contract under Request for Quotations No. 154160 . . . or in the alternative enjoin[ ]the Army from employing the funds obligated to the performance of any contract awarded to [Lockheed Martin], . . . or any entity other than [Plaintiff] for the services sought under the RFQ." *Id.* ¶ 23 (Request for Relief). In addition, the Complaint requests "reasonable costs and attorneys' fees, and such further relief as is determined just and fair." *Id.*

On July 17, 2007, a telephone status conference was convened, at which time the court declined to issue a temporary restraining order, because the Administrative Record had not been

filed. *See* 7/17/07 TR at 6-11, 17-18, 22. The court, however, issued an Order directing the Government to file the Administrative Record. *See* 7/17/07 TR at 28-30. On July 19, 2007, the court also entered a Scheduling Order for the filing of dispositive motions and convening an oral argument. On July 23, 2007, the Government filed the Administrative Record. *See* 7/17/07 TR at 4, 20-21. On July 24, 2007, the Government filed an Unopposed Motion for a Protective Order, which the court granted. On July 25, 2007, Plaintiff filed a Motion for Judgment on the Administrative Record and Memorandum in Support ("Pl. Mot.") and Statement of Facts.

On July 25, 2007, Plaintiff filed a Motion to Supplement the Administrative Record. On July 27, 2007, the Government filed a Response and Plaintiff filed a Reply. On July 27, 2007, the court convened a telephone status conference and issued an Order granting Plaintiff's July 25, 2007 Motion to Supplement the Administrative Record and also granting the Government's July 27, 2007 oral Motion to Supplement the Administrative Record. On July 30, 2007, Plaintiff introduced into the Administrative Record: Plaintiff's Supplemental Protest, *Axiom Resource Management Inc.*, B-298870.4; Plaintiff's Comments filed in *Axiom Resource Management Inc.*, B-298870.4; a May 13, 2007 Declaration of Ms. Nancy Adams (ret.), the former Senior Advisor to the Director of TMA and former Regional Director for the North TRICARE Regional Office; a May 13, 2007 Declaration of Mr. Ronald Richards, former Chief of the TMA Central Operations Office and Head of the Contracting Activity for TMA; May 13, 2007 and July 24, 2007 Declarations of Mr. Guy Strawder, Vice President for Military Medical Operations & Readiness, Axiom Resource Management Inc., and former Director of TRICARE Prime Operations at TMA; and a May 15, 2007 Declaration of Mr. Bruce Harma, Vice President for Regional Operations, Aurora, Colorado, Axiom Resources Management, Inc.[9] On July 30, 2007, the Government also was allowed to supplement the

[9] In *CACI, Inc.-Fed.* v. *United States*, 719 F.2d 1567, 1582 (Fed. Cir. 1983), the United States Court of Appeals for the Federal Circuit held that conflict of interest violations must be established by "hard facts." Although the Federal Circuit has not ruled on whether, or the circumstances under which, the Administrative Record may be supplemented, the United States Court of Appeals for the D.C. Circuit has allowed the Administrative Record to be supplemented in circumstances similar to those presented in this bid protest. *See Esch* v. *Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) ("[T]he procedural validity of the Department's action . . . remains in serious question. Particularly in [this] context, it may sometimes be appropriate to resort to extra-record information to enable judicial review to become effective.").

In this case, the court has exercised discretion to supplement the record with: Plaintiff's May 21, 2007 Supplemental GAO Protest (AR 899-906); Plaintiff's June 21, 2007 GAO Protest Comments (AR 907-17); the May 13, 2007 Declaration of Ms. Nancy R. Adams (AR 918-25); the May 13, 2007 Declaration of Mr. Ronald G. Richards (AR 926-33); the May 13, 2007 Declaration of Mr. Guy S. Strawder (AR 934-43); the May 15, 2007 Declaration of Mr. Bruce A. Harma (AR 944-48); the July 24, 2007 Declaration of Mr. Guy S. Strawder (AR 949-64); a May 24, 2007 letter from Mr. Gary Whittaker (affirming his recusal from Plaintiff's solicitation review) (AR 965-68); and April 27 and June 6, 2007 Response Memoranda by Mr. Daniel R. Signore, Contracting Officer. Mr. Harma and Mr. Strawder are Plaintiff's employees. Although the court agreed to supplement the Administrative Record with the Strawder and Whittaker Declarations, the court did not rely on those declarations in issuing this Memorandum Opinion and Order.

Administrative Record with: the May 24, 2007 Statement of Gary Whittaker, the COR of Plaintiff's incumbent contract; and April 27, 2007 and June 6, 2007 CO Memoranda responding to Plaintiff's GAO protests. *See generally* AR 899-978.

On August 3, 2007, the Government filed a Response to Plaintiff's Motion for Judgment on the Administrative Record and Cross-Motion for Judgment Upon the Administrative Record ("Gov't Mot.") and Counterstatement of Facts. On August 6, 2007, Plaintiff filed a Reply.

On August 7, 2007, the court held an oral argument on all pending motions ("8/7/07 TR 1-109").[10]

## III. DISCUSSION.

### A. Jurisdiction.

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, §§ 12(a), (b), 110 Stat. 3870 (1996) ("ADRA"), authorizes the United States Court of Federal Claims to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see also Banknote Corp. of Am., Inc.* v. *United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("The [United States] Court of Federal Claims has jurisdiction to review both pre-award and post-award bid protests pursuant to 28 U.S.C. § 1491(b), enacted as part of the Administrative Dispute Resolution Act of 1996[.]").

The post-award Complaint in this case alleges that the Army breached an implied duty of good faith and fair dealing in evaluating Plaintiff's proposal and ignored a potential OCI by awarding the task order to Lockheed Martin in violation of the RFQ and FAR § 9.5. *See* Compl. ¶¶ 19-20, 75-83. The court has determined that these allegations recite a sufficient basis for the court to exercise jurisdiction, pursuant to 28 U.S.C. § 1491(b)(1).

### B. Standing.

As a threshold matter, a protester must establish that it is an "interested party." 28 U.S.C. § 1491(b)(1). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" as synonymous with "interested party," as defined by the Competition in

[10] On September 8, 2007, Lockheed Martin sent a letter to the Army alleging that Plaintiff currently was performing work on 15 TMA contracts that presented potential OCIs and requested assurances that appropriate mitigation plans were in place. *See* AR 674-76. The merits of these allegations are not before the court.

Contracting Act, 31 U.S.C. §§ 3551-56.[11] *See Rex Serv. Corp.* v. *United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citations omitted); *see also Banknote Corp.*, 365 F.3d at 1352 (holding that the United States Court of Federal Claims' jurisdiction under the Tucker Act, as amended, is limited to "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." (quoting 31 U.S.C. § 1551)). Accordingly, the trial court must apply a two-part test to determine whether a protester is an "interested party," *i.e.*, the protestor must show that it was an *actual or prospective bidder* and the protester must have a *direct economic interest* in the procurement. *See Rex Serv. Corp.*, 448 F.3d at 1307 ("[T]o come within the [United States] Court of Federal Claims' section 1491(b)(1) bid protest jurisdiction, [the protester] is required to establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." (citations omitted)).

As part of the "direct economic interest" requirement, a protestor must show that any alleged errors caused the protestor "prejudice." *See Galen Med. Assocs.* v. *United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("'[T]o prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it.'" (quoting *Data Gen. Corp.* v. *Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (alterations in original))); *see also Myers Investigative & Sec. Servs., Inc.* v. *United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("prejudice (or injury) is a necessary element of standing."). The United States Court of Appeals for the Federal Circuit has advised trial courts that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached *before* addressing the merits." *Info. Tech. & Applications Corp.* v. *United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (emphasis added); *see also Myers*, 275 F.3d at 1369 ("standing is a threshold jurisdictional issue." (citations omitted)).

The United States Court of Appeals for the Federal Circuit, however, has held that a protestor can establish prejudice by showing a "substantial chance" that it would have received the award, if the alleged error was corrected. *See Bannum, Inc.* v. *United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005) ("To establish prejudice [plaintiff] must show that there was a 'substantial chance' it would have received the contract award but for . . . errors" in the bid process. (citations omitted)); *see also Statistica, Inc.* v. *Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) ("To establish competitive prejudice, a protestor must demonstrate that but for the alleged error, there was a '*substantial chance*' that [it] would receive an award-that is was within the zone of active consideration." (citations omitted) (emphasis and alterations in the original)).

### C. The Relevant Standards For Decision On The Administrative Record In A Bid Protest Case.

---

[11] The term "'interested party,' with respect to a contract or a solicitation or other request for offers described in paragraph (1), means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2)(A).

Pursuant to the Tucker Act, as amended by the ADRA, the United States Court of Federal Claims reviews challenges to agency decisions pursuant to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("[T]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]").

Accordingly, the United States Court of Appeals for the Federal Circuit has held that "a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; *or* (2) the procurement procedure involved a violation of regulation or procedure." *Galen Med. Assocs.,* 369 F.3d at 1329 (internal citations omitted) (emphasis added); *see also Bannum,* 404 F.3d at 1351 (holding that trial courts initially must determine if the Government "acted without rational basis or contrary to law when evaluating the bids and awarding the contract."); *Banknote Corp.*, 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citation omitted)).

A protester, however, bears a "heavy burden" of showing that an award decision had no rational basis. *See Impresa Construzioni Geom. Domenico Garufi* v. *United States*, 238 F.3d 1324, 1332-33 (Fed Cir. 2001). Therefore, when the court finds a "reasonable basis" for an agency's action, the court should "stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc.* v. *United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (citation omitted). This standard recognizes a zone of acceptable results in each particular case and requires that the final decision reached by an agency is the result of a process that "consider[s] the relevant factors" and is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co.* v. *Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also Impresa*, 238 F.3d at 1333-34 ("[T]he test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." (citation & internal quotations omitted)).

If a trial court determines that an agency's decision fails an APA review, the court is then obligated to inquire whether the protester was prejudiced by the Government's conduct. *See Bannum*, 404 F.3d at 1351 ("[I]f the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct."); *see also Impresa*, 238 F.3d at 1333 ("When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" (citations omitted)). A claim on the merits of a bid protest will only succeed if both requirements are satisfied. *Bannum*, 404 F.3d at 1351; *see also Galen Med. Assocs.*, 369 F.3d at 1330 ("'[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.'" (quoting *Data Gen. Corp.*, 78 F.3d at 1562) (alterations in original)). Prejudice, in this context, requires the protestor to show

a "substantial chance" that it would have received the contract award, but for the APA error. *See Bannum*, 404 F.3d at 1358 ("To establish prejudice Bannum was required to show that there was a 'substantial chance' it would have received the contract award but for the . . . errors in the bid process."); *see also Metcalf Constr. Co.* v. *United States*, 53 Fed. Cl. 617, 622 (2002) ("[M]inor errors or irregularities, *i.e.*, *harmless errors*, committed in the course of the procurement process are not sufficient grounds to warrant judicial intrusion to upset a procurement decision." (citation omitted) (emphasis added)).

### D. The Parties' Cross-Motions For Judgment On The Administrative Record.

#### 1. The Contracting Officer's Evaluation Of The Competing Parties' Technical Approach And Past Performance Rating.

##### a. The Plaintiff's Arguments.

Plaintiff asserts that the CO's evaluation was "defective," because Plaintiff should have received a higher Technical Approach rating than "Acceptable," since "[a]ccording to the [CO], [Plaintiff]'s proposal had no weaknesses other than its cost proposal was supposedly overstated in response to the Government-acknowledged ambiguous CLIN for Travel." *See* Pl. Mot. at 1, 13; *see also* 8/7/07 TR at 38. In fact, Plaintiff argues that "on numerous occasions [Plaintiff] went over and above the requirements of the RFQ." Pl. Mot. at 14-16 (citing Harma Decl. ¶¶ 4-5 at 1-4 (AR 944-47), Adams Decl. ¶¶ 18-19 at 7-8 (AR 924-25)). Therefore, Plaintiff concludes that "the Government failed to follow . . . stated evaluation criteria in performing the technical evaluation[,] because it based its award decision not on the information that the offerors were requested to provide, but rather on some other criteria that was not disclosed to [Plaintiff]." Pl. Mot. at 17.

Plaintiff also contends that its Good Past Performance rating should have been Exceptional, because "the [CO] only contacted two of [Plaintiff]'s four past performance references, and one of the references **NOT** contacted was Axiom's reference for its performance of the incumbent contract for the services sought under the RFQ."[12] *See* Compl. ¶ 20 (bold in original).

In addition, Plaintiff complains that the CO unlawfully downgraded Plaintiff's Technical Approach rating and determined that Plaintiff's cost proposal was overstated, without engaging in any discussion. *See* Pl. Mot. at 19 (citing *Bank of America*, Comp. Gen. B-287608 *et al.*, July 26, 2001, 2001 CPD ¶ 137, 2001 WL 930712 at *7 ("While it is true that an agency need not 'spoon-feed' an offeror by directing it to each and every item that could possibly be revised to

---

[12] It is unclear from the Administrative Record when the COR for the incumbent requirement informed Plaintiff of his recusal "from subject procurement action prior to the evaluation being conducted because of a perceived personal conflict of interest, *i.e.*, my wife works for Lockheed Martin Information Technology Division." AR 965. Plaintiff asserts that it should have been advised of the recusal earlier and given the opportunity to provide another reference. *See* Pl. Mot. at 18; *see also* TR at 50-51.

enhance its rating, where an agency has a central concern which affects multiple portions of an offeror's proposal and which, if unaddressed, will effectively eliminate that offeror from competition, fairness and equity dictate that such concern be brought to the offeror's attention." (citation omitted))).

**b. The Government's Response.**

The Government disputes that Plaintiff's proposal was evaluated improperly. *See* Gov't Mot. at 7. First, the Government responds that the fact that Plaintiff's Technical Approach had no weaknesses does not entitle Plaintiff to the highest rating. *Id.* at 7 (citing *Pflow Industries, Inc.*, Comp. Gen. B-289970, May 20, 2002, 2002 CPD ¶ 85, 2002 WL 1015333 at *1 (protest challenging technical evaluation of proposals was denied where agency reasonably found awardee's proposal was entitled to higher ratings than protester's based on level of detail found in the proposals)). In addition, the Government insists that there is no support for Plaintiff's assertion that Lockheed Martin's competing proposal was indistinguishable from Plaintiff's. *See* Gov't Mot. at 9 (citing AR 466 ("Lockheed Martin's 21st Century (LM21) Process illustrates continuous process improvement which will enhance the performance of the requirements by reducing program costs and delivering maximum efficiency.")); *see also* 8/7/07 TR at 84-86.

The Government also argues that even if Plaintiff's Technical Approach and Past Performance were rated incorrectly, Plaintiff cannot show prejudice. Lockheed Martin would have been awarded the Task Order, because Lockheed Martin's proposed price was lower. *See* Gov't Mot. at 9. Finally, the Government contends that the CO's decision to downgrade Plaintiff's proposal, without any discussion, was not in error, because the RFQ advised offerors that there would be no such discussions. *See* Gov't Mot. at 11 (citing AR 2 ("The Government intends to award a task order without discussions. Offerors should provide their best, complete proposal upon initial submission. The Government reserves the right to hold discussions if deemed necessary by the Contracting Officer.")); *see also* 8/7/07 TR at 87.

**c. The Court's Resolution.**

The court has determined that despite apparent errors in Plaintiff's Technical Approach[13] and Past Performance ratings,[14] Plaintiff cannot demonstrate prejudice with respect to the CO's overall rating of Plaintiff's proposal. *See Galen Med. Assocs.*, 369 F.3d at 1330 ("'[T]o prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it.'" (quoting *Data Gen. Corp.*, 78 F.3d at 1562) (alterations in original)); *see also Bannum*, 404 F.3d at 1358 ("To establish prejudice Bannum was required to show that there was a 'substantial chance' it would have received the contract award but for . . . errors in the bid process."). Even if Plaintiff had received Technical Approach and Past Performance ratings of "Exceptional" and was rated equal to Lockheed Martin in non-price/cost factors, Lockheed Martin's lower price still trumped Plaintiff's price. *See* AR 443, 453, 466, 468-69; *see also* TR at 42-43, 82-83. Therefore, Plaintiff does not have standing to contest the award of the Task Order to Lockheed Martin, because of the CO's alleged selective and arbitrary evaluation of Plaintiff's overall proposals. *See, e.g.*, *Info. Tech. & Applications Corp*, 316 F.3d at 1319 (Fed. Cir. 2003) ("[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits."); *Myers*, 275 F.3d at 1369 (recognizing that "standing is a threshold jurisdictional issue[.]" (citations omitted)).

### 2. The Contracting Officer's Exercise Of Discretion Regarding Organizational Conflicts Of Interest.

---

[13] In rating Lockheed Martin's Technical Approach as "Exceptional," Evaluator 1 found no weaknesses, but one strength: that the "[on]-site HR Manager and on-site Senior Program Manager will ensure a smooth transition of current employees and current tasks." AR 370. Although the employees at issue already worked for Plaintiff and no transition was needed, this same evaluator inexplicably rated Plaintiff's Technical Approach only as "Acceptable." *See* AR 397; *see also* Adams Decl. at 7 (AR 924) ("[Lockheed Martin] received an Exceptional rating[;] however, the bulk of this evaluation appears to be based solely on the fact that [Lockheed Martin] stated that it intended to hire the employees of the Protestor[.]"); 7/17/07 TR at 6; 8/7/07 TR at 38.

[14] Plaintiff's argument that the Past Performance rating was flawed also has merit. In addition to not receiving a rating from Plaintiff's most important reference, because of a recusal, there are other significant inconsistencies in the record. *See, e.g.*, AR 411-12 (Evaluator 2 rated Plaintiff as "Exceptional" on the evaluation of Past Performance, but this was downgraded, without any explanation, to "Good" on the final page where the Overall Evaluation is listed); AR 467, 534 (the two Award Memoranda explaining Plaintiff's Past Performance rating are inconsistent).

Plaintiff's argument that the CO improperly assigned lower ratings without discussion, however, has no merit. The RFQ explicitly stated that prospective offerors should expect no discussions: "The Government intends to award a task order without discussions." AR 2.

On the other hand, Plaintiff has established that it was an actual bidder with a direct economic interest in the procurement and had a substantial chance of being awarded the Task Order, if the CO's OCI assessment was made in accordance with FAR requirements. *See* AR 208-353; *see also Statistica, Inc.* v. *United States*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) ("To establish competitive prejudice, a protestor must demonstrate that but for the alleged error, there was a substantial chance it would receive an award[.]" (citations & internal quotations omitted)). For the reasons that follow, the court has determined that the CO's OCI assessment was not made in accordance with FAR requirements. Therefore, the court has determined that Plaintiff has standing to protest the award of the Task Order to Lockheed Martin on this ground. *See* Ralph C. Nash, *Protests: The 'No Prejudice' Rule*, 11 No. 5 NASH & CIBINIC REPORT ¶ 20 (May 1997) ("[One] reason that prejudice becomes an issue is because the procurement is flawed. This leads us to ask: did anyone do anything about the failure to observe the statute or regulation?").

**a. The Plaintiff's Arguments.**

First, Plaintiff argues that the award of the contract to Lockheed Martin violates the Intent of Statement of Work, because "[t]he contractor for TAD duties must become an extension of the government staff, and the government is obligated to ensure that there are no conflicting business interests that could be exploited due to the *Unequal Access to Information* (as described in numerous HA/TMA SOW) that could be used by the supporting contractor's firm." Pl. Mot. at 31 (emphasis in original). Under the terms of the award, Lockheed Martin "would have access to the CONOPS, FRD, cost estimates and other critical documents for essentially every aspect of healthcare delivery[.]" *Id.* at 32. Plaintiff also notes that the RFQ states that the concurrent performance of Category 2 and 3 contracts *ipso facto* creates an OCI. *Id.* at 5. Therefore, because Lockheed Martin already performs Category 3 contracts for TRICARE, an OCI is created if Lockheed Martin is awarded the Category 2 Task Order at issue in this case. *Id.* at 20-21 (citing AR 604); *see also* 8/7/07 TR at 53.

Next, Plaintiff identifies the failure to appreciate the difference between "purchased care" and "non-purchased care" services as the cause of the CO's errors, because even if Lockheed Martin is not currently providing "purchased care" services for TRICARE, "the nature of the Category 2 work and the identified awardee's business practices make it clear that an OCI remains." *See* Pl. Mot. at 21; *see also* Richards Decl. ¶¶ 6-7, 12 at 3-4 (AR 928, 931); 8/7/07 TR at 20-21, 27-28. In addition, the CO failed to consider relevant information in performing the OCI analysis, because the CO did not have all of the documents until the week of May 7, 2007, after the third GAO protest was filed. *See* Pl. Mot. at 37-38 (citing *Greenleaf Construction Co., Inc.*, Comp. Gen. B-293105.18, Jan. 17, 2006, 2006 CPD ¶ 19, 2006 WL 249626 *1 (sustaining protest and ordering the contracting officer to revise OCI analysis after considering the effect of certain future payments owed to the awardee.)).

Therefore, if Lockheed Martin is awarded the Task Order, it will have inappropriate access to program information stemming from "oversight of the multi-billion dollar expenditures for purchased care services and T-3" and the daily responsibility for "continuous updates on promulgating TRICARE policy, operations, procedures, concepts of operations, and contract

modifications[.]" Pl. Mot. at 33; *see also* Adams Decl. ¶¶ 7-13 at 2-5 (AR 919-22); Richards Decl. ¶¶ 8-11 at 4-6 (AR 929-31); 8/17/07 TR at 20-21. In addition, Plaintiff predicts that Lockheed Martin's future participation in crafting requirements, orchestrating industry forums, clarifying questions of potential bidders, and responding to protests for T-3 will have a "chilling effect" on other contractors' willingness to share information at forums or submit proposals to compete for T-3 contracts for fear that Lockheed Martin may use propriety information to gain a competitive advantage in their Category 3 business endeavors. *See* Pl. Mot. at 23-24; *see also* 8/7/07 TR at 21-23, 27-29.

More importantly, Plaintiff argues that Lockheed Martin's mitigation plan is inadequate, because the fire walls, other voluntary measures, and non-disclosure agreements will not remedy an "impaired objectivity" conflict. *See* Pl. Mot. at 34-35 (citing Gordon, *Organizational Conflicts of Interest: A Growing Integrity Challenge*, 35 PUB. CONT. L.J. 25, 39 (2005)); *see also* Adams Decl. ¶¶ 16-17 at 6-7 (AR 923-24); Richards Decl. ¶¶ 11-15 at 5-8 (AR 930-33). Accordingly, Plaintiff concludes that "TMA's analysis of the OCI . . . is wholly inadequate as it is solely based on [Lockheed Martin]'s self-serving and totally unauditable mitigation plan . . . [and] . . . the contracting officer's determination on this point is totally based on the TMA analysis and cannot be believed." Pl. Mot. at 19; *see also* 8/7/07 TR at 22-23.

**b. The Government's Response.**

The Government responds that "the CO 'identif[ied] and evaluate[d] potential organizational conflicts of interest,' and 'avoid[ed], neutralize[d], or mitigate[d]' the potential conflict, as directed by the FAR." Gov't Mot. at 14 (citing 48 C.F.R. § 9.504(a)(1)); *see also* 8/7/07 TR at 58. Specifically, after Plaintiff filed the first GAO protest, the CO took corrective action by documenting the pre-award analysis of a potential OCI (AR 537-38) and issuing a new Source Selection Decision (AR 530-36). In addition, in response to Plaintiff's second protest, the CO further examined:

> a. existing contracts with Lockheed [Martin] in a TMA OCI category other than the one designated for this procurement, as submitted and certified by Lockheed [Martin];
>
> b. the Procurement Request and the OCI Mitigation Certification completed by . . . Lockheed [Martin];
>
> c. the latest revised PBSOW (Performance Based Statement of Work);
>
> d. all relevant portions of Lockheed [Martin]'s proposal describing the offeror's work for others, experience pertinent to the proposed TMA effort, as well as the resumes of key personnel;
>
> e. the disclosure and representation statements and any other information bearing on the OCI determination which was submitted or disclosed by (i) Lockheed [Martin], (ii) intended consultants or sub-contractors at any tier

where they may be performing services similar to the services performed by the prime contractor, (iii) any affiliates of the foregoing, and (iv) Chief Executive and directors of any of the foregoing who will be involved in the performance of the contract;

f. other OCI-related documentation, such as Lockheed [Martin]'s OCI Risk Mitigation Plan.

Gov't Mot. at 17; *see also* 8/7/07 TR at 73-75.

Based on the foregoing analysis, the Goverment contends that the CO "reasonably" concluded that, because Lockheed Martin employees will not have access to extensive data concerning "non-purchased care" requirements, no OCI exists. *See* Gov't Mot. at 17-18 (citing AR 612-16); *see also* 8/7/07 TR at 87-88. Moreover, the CO's decision that the potential OCI was mitigated "'by eliminating [Lockheed Martin] from competing on any new requirements for *purchased care contracts*'" was reasonable. Gov't Mot. at 18. (emphasis added) (quoting AR 624 and citing *Informatics Gen. Corp.* v. *Weinberger*, 617 F. Supp. 331, 333-34 (D.D.C. 1985) (OCI mitigation efforts were found adequate where the winning bidder was barred from competing on related contracts for three years: "It cannot seriously be argued that such an approach is inconsistent with the FAR conflict mitigation provisions.")); *see also* 8/7/07 TR at 68. In the event, however, that Lockheed Martin employees working on the Task Order obtain access to sensitive "non-purchase" care information, the CO "reasonably" concluded that Lockheed Martin's non-disclosure agreements would prevent a conflict. *See* 8/7/07 TR at 90.

**c. The Court's Resolution.**

**i. Federal Acquisition Regulation Requirements Regarding Organizational Conflicts of Interest.**

Federal Acquisition Regulation ("FAR") Section 9.5 imposes several procedural requirements on the CO to identify and mitigate actual and potential OCIs, *i.e.*, "unequal access to

information,"[15] "impaired objectivity,"[16] and "biased ground rules."[17] *See* 48 C.F.R. § 9.505. First, the CO is required to "[i]dentify and evaluate potential organizational conflicts of interest *as early in the acquisition process as possible*; and . . . [a]void, neutralize, or mitigate significant potential conflicts before contract award." 48 C.F.R. § 9.504(a) (emphasis added). Next, the CO is required to "obtain the advice of counsel and the assistance of appropriate technical specialists in evaluating potential conflicts and in developing any necessary solicitation provisions and contract clauses." 48 C.F.R. § 9.504(b). In addition, the CO's compliance with these requirements must be documented "when a substantive issue concerning potential organizational conflict of interest exists." 48 C.F.R. § 9.504(d).

In addition to these procedural requirements, the FAR also mandates that the CO "shall award the contract to the apparent successful offeror *unless a conflict of interest is determined to exist that cannot be avoided or mitigated*." 48 C.F.R. § 9.504(e) (emphasis added). More importantly, FAR requires that "[t]he [CO] exercise . . . common sense, good judgment, and sound discretion . . . in both the decision on whether a significant potential conflict exists and, if it does, the development of an appropriate means for resolving it." 48 C.F.R. § 9.505.[18]

**ii. The Contracting Officer Initially Failed, But Later, Identified And Analyzed One Potential Organizational Conflict Of Interest.**

In this case, the RFQ "categorized all its non-purchased care requirements into three broad categories . . . for the purposes of identifying, avoiding or mitigating against . . . OCIs in accordance

---

[15] An "unequal access to information" conflict occurs when a government contractor has access to non-public information in connection with performance of a government contract that may afford a competitive advantage in subsequent competition for a government contract. *See* 48 C.F.R. § 9.505-4; *see also Aetna Gov't Health Plans, Inc.*, Comp. Gen. B-254397.15, July 27, 1995, 95-2 CPD ¶ 129, 1995 WL 449806, at *8-9.

[16] An "impaired objectivity" conflict occurs when a government contractor has conflicting obligations under different government contracts, that compromises the contractor's ability to render impartial judgment. *See* 48 C.F.R. § 9.505-3; *see also Aetna Gov't Health Plans*, Comp. Gen. B-254397.15 at *9.

[17] A "biased ground rules" conflict occurs when a government contractor writes the statement of work or in some other way sets the ground rules for another government contract, and *ipso facto* has the ability to skew the competition in favor of the contractor. *See* 48 C.F.R. §§ 9.505-1, 9.505-2; *see also Aetna Gov't Health Plans*, Comp. Gen. B-254397.15 at *8-9.

[18] Of course, if the CO "finds that it is in the best interest of the United States to award the contract notwithstanding a conflict of interest," the CO may make an award, but only after issuing a waiver decision. *Id.* In this case, the CO did not issue a waiver decision.

with FAR Subpart 9.5,"[19] but did not prohibit award of the Task Order to an offeror with an actual or potential OCI. *See* AR 5, 526. Instead, the RFQ required that a voluntary mitigation plan be implemented to identify and mitigate any such conflict. *Id*. In this case, however, the CO initially did not "[i]dentify and evaluate *potential* organizational conflicts of interest" nor do so as early in the acquisition process as possible." 48 C.F.R. § 9.504(a)(1) (emphasis added); *see also Filtration Development Co.* v. *United States*, 60 Fed. Cl. 371, 377-78 (2004) (finding that the identification of the OCI did not occur as early in the acquisition process as possible). Although the Government attempts to justify the CO's oversight by arguing that the OCI was only potential, the FAR clearly places a duty on the CO to identify, analyze, and mitigate both potential and actual conflicts:

> An organizational conflict of interest may result when factors create an actual or *potential* conflict of interest on an instant contract, or when the nature of the work to be performed on the instant contract creates an actual *or potential conflict of interest on a future acquisition.* In the latter case, some restrictions on future activities of the contractor may be required.

48 C.F.R. § 9.502(c) (emphasis added).

Only after Plaintiff filed the first GAO protest did the CO take any action to investigate even a potential OCI. *See* AR 516, 530-38; *see also* 48 C.F.R. § 9.504(a)(2) ("Using the general rules, procedures, and examples in this subpart, contracting officers shall analyze planned acquisitions in order to . . . [a]void, neutralize, or mitigate significant potential conflicts before contract award."); 48 C.F.R § 9.504(d) ("The contracting officer's judgment need be formally documented only when a substantive issue concerning potential organizational conflict of interest exists."). In this case, however, the CO's "investigation" relied exclusively on the November 30, 2006 TMA Organizational Conflicts of Interest Assessment. *See* AR 526 ("The information provided in Parts A and B becomes the principal basis upon which the Contracting Officer makes a finding (Part C) as to the existence of a possible conflict and is the principle basis of review of that finding by the Contracting Officer.").

After Plaintiff identified inadequacies in the CO's OCI identification and analysis, a second GAO protest was filed. *See* Compl. ¶ 22. In response, the TMA prepared a February 15, 2007 OCI Review Information Memorandum, revised on March 28, 2007 to reflect a more thorough analysis,

---

[19] FAR § 9.502(c) provides:

> An organizational conflict of interest may result when factors create an actual or potential conflict of interest on an instant contract, or when the nature of the work to be performed on the instant contract creates an actual or potential conflict of interest on a future acquisition. *In the latter case, some restrictions on future activities of the contractor may be required.*

48 C.F.R. § 9.502(c) (emphasis added).

including: (1) the six areas of program support subject to the RFQ, *i.e.*, Program Management Support, Office of General Counsel Support, Transition and Integration Contract Support, Administrative Support, Special Studies and Trend Analysis Support, and Subject Matter Expert Support; (2) the placements for successful offeror employees, *i.e.*, TMA Office of General Counsel ("OGC") (legal assistants), TMA OGC General Law Division (paralegals and legal assistants), TMA OGC Appeals, Hearings, and Claims Collection Division (recoupment specialists), TAD Chief of Staff Office, TAD Medical Benefits and Reimbursement Systems Office, TAD Network Operations, TAD DEERS, TAD Contract Operations Office, TAD Beneficiary and Provider Services Office, TAD Human Resources, and TAD Mail Room; and (3) the RFQ, the revised statement of work, Lockheed Martin's OCI Certification, OCI Mitigation Plan and Comparative Analysis, and key personnel resumes. *See* AR 580-611.

Based on these efforts, the court has determined that, although the CO initially failed to identify and analyze the potential for an "unequal access to information" conflict, that error was corrected in part, albeit late. The fact that the CO facially conducted a thorough analysis, however, is not dispositive of whether the CO exercised "common sense, good judgment and sound discretion . . . [in] the development of an appropriate means for *resolving* [a conflict.]" 48 C.F.R. § 9.505 (emphasis added). This was an issue raised during the oral argument.

GOVERNMENT COUNSEL: [T]he mitigation program *proposed by Lockheed* is significant.

I mean, it contains not only five separate levels of mitigation that are fact contingent, *but Lockheed also engaged* in a comparative analysis wherein *Lockheed looked* at all of its government contracts to determine whether OCIs existed.

*Lockheed proposed* as part of its mitigation efforts firewalls, physical security, employee access, computer security, information protection, nondisclosure agreements, a number of matters. . .

THE COURT: And they may well be more than adequate. I just don't know. That's what I'm saying. I just don't know whether they're adequate or not.

You say the government is satisfied that they're adequate, but, you know, this is the same people that basically said there wasn't a conflict to begin with.

| | |
|---|---|
| GOVERNMENT COUNSEL: | Well, the government . . . redid its analysis under a separate framework in Tab 32. That was a 17 page analysis. The government went back again and engaged in a third analysis, and that's at Tab 33. |
| THE COURT: | And did it change its view of the mitigation plan during the separate – |
| GOVERNMENT COUNSEL: | No, Your Honor. . . There's 45 pages of analysis, yet they don't even cite to what the Army did in their brief. That's not the inquiry. . . There's 45 pages of analysis here, but with respect to the – |
| THE COURT: | You keep going on, but, I mean, the number of pages does not equate to the quality of the review. If that were true then, you know, you could then basically pull out pages of the phone book, staple them together with prose in the front and the back. |
| GOVERNMENT COUNSEL: | I agree, Your Honor. |
| | * * * |
| THE COURT: | What I'm looking at is to determine whether or not there may be potential violation of law and, if so, is the mitigation proposal an actual remedy? Is that an adequate remedy to be an appropriate mitigation? That value judgment is not made based on the number of pages. |

8/7/07 TR 73-76 (emphasis added).

**iii. The Contracting Officer Did Not Exercise Sound Judgment In Developing An Appropriate Mitigation Plan.**

As for the adequacy of the proposed mitigation plan, on April 2, 2007, the CO endorsed the March 28, 2007 revised TMA OCI Review Informational Memorandum and issued an OCI Determination, relying in large part on the fact that Lockheed Martin had no current Category 1 type contracts and promised not to perform any Category 1 type contracts in the future. *See* AR 616. As

the court recognized in oral argument, excluding Lockheed Martin from bidding on Category 1 type contracts, however, may not be meaningful mitigation:

> THE COURT: Well, the government said they were going to preclude Lockheed from competing for –
>
> PLAINTIFF'S COUNSEL: *Purchased care.*
>
> THE COURT: Right, and that solves the problem.
>
> PLAINTIFF'S COUNSEL: Right, but it seems to me I don't think there's been any indication that Lockheed Martin Federal Health Care is interested in running the *health clinics* themselves. They've only been –
>
> THE COURT: Right. They're not interested in being Kaiser Permanente per se.
>
> PLAINTIFF'S COUNSEL: Right. Right.
>
> THE COURT: Right. So in fact if that's the remedy[,] then it's kind of illusory.

8/7/07 TR at 33 (emphasis added).

As to Category 2 and Category 3 type contracts, the CO was satisfied that Lockheed Martin would not have access to "*extensive data*" concerning "non-purchased care" information. *See* AR 616 (emphasis added). Nevertheless, the CO ultimately conceded that a *potential OCI* existed that could create an unfair competitive advantage, if Lockheed Martin bid on "purchased care" contracts in the future.[20] *Id*. 611, 616.[21]

---

[20] Lockheed Martin employees also will have access to agency source selection information; contract administration information; contract performance information; and contract litigation information for "purchased care procurements;" and information related to new requirements implemented for "purchased care" Managed Care Support. *See* AR 616.

[21] It appears from the Administrative Record that the CO also failed to consider relevant documents in performing the OCI analysis. *See* Pl. Mot. at 37 ("The contracting officer's analysis of the OCI claimed that it was based on the documents sought in undersigned counsel's correspondence, dated May 4, 2007; however, this cannot be true since the contracting officer did not have those documents until the week of May 7, 2007."). Accordingly, the court is unable to verify whether the CO ever read these documents, the content of which may have been relevant in this case.

The TMA's Revised OCI Review Information Memorandum also concluded that the potential OCI was mitigated by current: "TMA *policy* to exclude as potential contractors, subcontractors, vendors, etc. any entity that provides the type of services that Lockheed [Martin] employees will be providing if it is the successful offeror for this procurement." *See* AR 610 (emphasis added); *see also* 48 C.F.R. § 9.502(c) ("In the latter case [of a potential conflict of interest], some restrictions on future activities of the contractor may be required."). In addition, the promise of voluntary Lockheed Martin mitigation efforts clearly was influential in the CO's decision. *See* AR 606, 610, 616; *see also* 8/7/07 TR at 73. As previously discussed, such measures include: fire walls; non-disclosure agreements; training; physical security; employee access; computer security; information protection; employment transfers; tiered mitigation; OCI review boards; audits; management reporting; and corporate oversight. *Id*. The CO also was impressed with Lockheed Martin's Corporate Policy that: "*Generally*, we will not pursue a contract that requires the successful offeror to provide source selection support if we are also interested in pursuing product offerings that conflict with that support." *See* AR 606 (emphasis added).

The competitive significance of the potential conflicts arising from the award of the Task Order to Lockheed Martin also was discussed in detail by Ms. Nancy R. Adams and Mr. Ronald R. Richards, independent witnesses with extensive relevant contracting and health care experience.[22]

First, Ms. Nancy R. Adams served concurrently as the Commander of Triple Army Medical Center, the Commander of the Pacific Regional Medical Command, TRICARE Pacific Lead Agent, United States Pacific Surgeon, and the Professional Filler Commander (PRODIS) of the 18th Medical Command, Korea. She also served as the Senior Advisor to the Director of TMA (July 2002-April 2004) and Regional Director for the Northern TRICARE Regional Office (April 2004-to her retirement in August 2005). In these positions she was involved in "the planning and implementation of the three categories of procurements relating to the acquisition of purchased and non-purchased care services by TMA[,] described in the [RFQ]." Adams Decl. ¶ 2 at 1 (AR 918); *see also id*. ¶ 3 at 2 (AR 919).

Ms. Adams represented to the court that, based on her experience and knowledge of TRICARE and this procurement, "there is an organizational conflict of interest in the award of the present contract [concerning Category 2 Program Management Support Services] to [Lockheed Martin], and the awardee's proposed mitigation plan is inadequate to resolve this conflict." Adams Decl. ¶ 5 at 2 (AR 919). In fact, Ms. Adams directly challenged the CO's determination that Lockheed Martin would not have access to extensive data concerning non-purchased care information. *Compare* AR 616 *with* Adams Decl. ¶ 7 at 2, 3 (AR 919-20) ("In a letter dated April

---

[22] The CO's June 6, 2007 Declaration alleges that Ms. Adams' and Mr. Richards' testimony should be disregarded, because "it is common knowledge these people are being paid and/or have a vested interest in Axiom successfully protesting this award. The value of their declarations is minimal, if any, and their *opinion* is just that." AR 968. Third party witnesses with particular expertise usually are paid for their opinions. The Government had the same opportunity as Plaintiff to submit outside testimony to rebut Ms. Adams and Mr. Richards and declined to proffer such testimony.

6, 2006, the same Contracting Officer stated, 'Lockheed [Martin] employees do not have access to extensive data concerning non-purchased care TMA contractors.' For reasons articulated above (paragraphs 5 and 6) I do not believe that is a factual statement. Also that statement ignores the integrative processes that are vital to operating the Military Health Care System (MHS) which is the core business supported by TMA. It is not good business for the MHS to develop administrative systems in isolation from the delivery of health care services that result from the purchased care contracts.").

Ms. Adams concluded that the CO's mitigation plan "will do nothing to resolve the OCI issues identified by TMA in Tabs 3, 33-36 of the [Administrative] Record[.]" Adams Decl. ¶ 8 at 3 (AR 920). Specifically, "[c]ontrary to the [CO's] assertion, the requirements and performance of the work for the Category 2 contract will be integral to future developments in TMIP and other American military healthcare related systems." *Id.* Accordingly, Ms. Adams posited that "if you argue that the purchased care and non-purchased care contracts should be worked discretely and functional integration is not a goal [*see* Tab 35], what causes me concern is how do you discriminate in an office environment work [that] is purchased care from that which is clearly non-purchased care?" Adams Decl. ¶ 9 at 3 (AR 920); *see also id.* ¶ 11 at 4 (AR 921) ("[H]ow [do] you identify information that is specific and relevant only to purchased care from non-purchased care services, a central component of [Lockheed Martin's] plan[?] The non-purchased care support provides a framework for the movement of information that links to purchased care services."); *see also id.* ¶ 9 at 3-4 (AR 920-21) ("The offices described in [the contracting officer's] memorandum (and supported by the contracts relevant to this Protest) are work centers that are shared by all of TMA. If there are [Lockheed Martin] employees in OGC and TAD[, then] documents and conversations are going to be shared regardless of their ultimate classification (purchased care or non-purchased care services)."); *see also id.* ¶ 11 at 4 (AR 921) ("[Regarding the Lockheed Martin mitigation plan], what I cannot comprehend is how you identify information that is specific and relevant only to purchased care from non-purchased care services, a central component of [Lockheed Martin]'s plan.").

In addition, Ms. Adams observed that, although the RFQ specifies that "[P]rogram management support services to the TRICARE Acquisition Directorate (TAD) to operationalize the TRICARE program" nominally is Category 2 work, "the integration of administration and management support systems must be fully accounted for in TRICARE operations," *i.e.*, coordination between Category 2 and Category 3, the "essence of TRICARE operations," is required to be "fully accounted for in TRICARE operations." Adams Decl. ¶ 13 at 5 (AR 922). Moreover, based on past experience with a prior initiative, *i.e.*, Enterprise-Wide Referrals and Authorization System, Ms. Adams cautions that the Government "should not artificially construct barriers to separate Program Management Support (Category 2)[,] which is purchased care services[,] from Product Support (Category 3)[,]" because of risks in "implementation." Adams Decl. ¶ 14 at 6 (AR 923). Therefore, Ms. Adams recommended that the "linkage between Category 2 and Category 3 mandates that a different contractor be involved in each category in order to avoid [an] OCI." *Id.*

In sum, Ms. Adams identified "two glaring errors" in the award of the Task Order to Lockheed Martin, not addressed by the proposed mitigation plan:

> My conclusion is there are two glaring reasons why the OCI approach presented by LMHF and the government are inadequate. To achieve integration of the MHS in terms of the business of health care and the delivery of care to the beneficiaries, TMA needs to cross walk the administrative support provided by Category 3 work with the purchased care that results from Category 2 work. If TMA chooses to continue to view Category 2 work separate and distinct from [C]ategory 3, the open organization, common work centers, personal relationships, and the nature of health care information will make safe guarding of information between LMHF Category 2 employees and LMHF Category 3 employees an unattainable goal.

Adams Decl. ¶ 17 at 7 (AR 924).

Second, Mr. Ronald G. Richards served as TMA's Chief of Central Operations Office and TMA's Head of the Contracting Authority from 2001 until his retirement in 2006. *See* Richards Decl. ¶ 1 at 1-2 (AR 926-27). Mr. Richards agreed that TMA properly identified that Lockheed Martin had a potential conflict, because "[Lockheed Martin] employees will have access to non-public information which could, in the future, create an unfair competitive advantage." Richards Decl. ¶ 11 at 5-6 (AR 930-31). Because, however, "[b]y the very nature [of] the *interdependency between the purchased care and non-purchased care elements of the TRICARE program*[,] any change to TRICARE will most likely effect a change in either a TMA or non-purchase care information system, [t]hereby giving any contract personnel working on this effort access to non-purchase care requirements." *Id.* ¶ 12 at 6 (AR 931) (emphasis added). Therefore, "[w]hen the contract requirements for the non-purchase care information system are being developed by the TRICARE Acquisitions Directorate they will be supported by the Lockheed [Martin] contract employees. This will require the Lockheed [Martin] contract employees to acquire access to extensive data concerning non-purchased care contractor requirements." *Id.*

Although current "TMA Policy" nominally prohibits Lockheed Martin from bidding, as a prime or subcontractor, on any "purchased care" procurements, Mr. Richards advised that such non-binding promises were insufficient to mitigate against the potential OCI identified. *See* Richards Decl. ¶ 13 at 7 (AR 932). Instead, Mr. Richards advised the court that Lockheed Martin also "should be prohibited from doing any current and future purchase care and non-purchase care category 3 contract[s]." *Id.* Moreover, "[w]hile the Lockheed [Martin] OCI Mitigation plans provide a litany of processes and procedures that *can be employed* when addressing mitigation[,] the issue of effective implementation still remains. Given that there is no conceivable way for the government to effectively police these plans how will the government insure that Lockheed [Martin]'s OCI Mitigation plans actual[ly] perform as stated?" Richards Decl. ¶ 14 at 7 (AR 932) (emphasis added).

Accordingly, both Ms. Adams and Mr. Richards advised the court that, if Lockheed Martin is to be awarded the Task Order, Lockheed Martin must be prohibited from performing "non-purchased care" Category 3 contracts. *See* Adams Decl. ¶ 17 at 7 (AR 924); Richards Decl. ¶¶ 13-14 at 7 (AR 932).

In addition, at the oral argument the court expressed particular concern about the voluntary nature of the mitigation proposal.

THE COURT: I don't know that the government's proposed remedy, what we have here, which is kind of like a statement of "I promise to be good."

I'm not so sure I'm satisfied with this, and it's possible that the Court . . . would want to have some of this incorporated into a consent decree of some sort under the Court's jurisdiction.

I don't even know if the remedy is appropriate. It may not go far enough.

8/7/07 TR at 10.

PLAINTIFF'S COUNSEL: [T]hey say in their corporate statement -- it's Attachment B to their technical proposal -- that they're not going to bid on any contract where they might have access to source selection information.

Well, that's exactly what they did here so they violated their own corporate policy in bidding on this contract, so how can you have faith or anyone have faith even if they're trying to be fair and square? It's a large company. Things slip through the cracks.

8/7/07 TR at 23.

THE COURT: *What I'm more concerned about is the remedy that they came up with and whether or not it really does address the conflict*. Just because the government says Lockheed Martin gave us this piece of paper and they said we will do all these things, why do we know that that would be appropriate?

8/7/07 TR at 59 (emphasis added).

GOVERNMENT COUNSEL: Well, I mean, again the problem with a mitigation plan, obviously you need to make sure that they're not just saying something.

THE COURT: Right.

GOVERNMENT COUNSEL: But there is no way of proving that, Your Honor, unless there is an actual OCI that occurs so that you can check did you do the work. That exceeds the requirement of the FAR.

THE COURT: Read the FAR again. Read the last portion of it.

GOVERNMENT COUNSEL: It states, "The contracting officer shall award the contract to the apparent successful offeror unless a conflict of interest is determined to exist that cannot be avoided or mitigated." That's at subpart (e).

THE COURT: And the issue here is can it be mitigated? We don't know the answer to that. I don't know whether or not Tab 32 mitigates. It's 17 pages. It's nicely typed. You know, it's got headings and tabs and things like that, but I don't know whether it does the job or not.

So what I'm suggesting what I think makes some sense here is to see if I can get some guidance on that issue[.]

GOVERNMENT COUNSEL: Your Honor, I respectfully submit that I think that exceeds -- I think that betrays -- the language in . . . the Federal Circuit that when it comes to regarding the minutia of the procurement –

THE COURT: This is not the minutia of the procurement. This is an issue of whether there was a conflict of interest, which the government identified that there was. It's hardly minutia.

GOVERNMENT COUNSEL: Your Honor, the government stated there is a potential conflict of interest.

| | |
|---|---|
| THE COURT: | Then presumably that's not minutia . . .This is a central issue in this procurement. The government recognized that. |

8/7/07 TR at 78-80.

The sparse case law of the United States Court of Federal Claims regarding conflicts of interest typically analyzes an agency's corrective action under a "reasonableness standard." *See*, *e.g.*, *Chapman Law Firm Co.* v. *United States*, 71 Fed. Cl. 124, 131 (2006), *aff'd in part* (on other grounds), *reversed in part, and remanded*, 490 F.3d 934 (Fed. Cir. 2007) (regardless as to whether a "proposed corrective action is reasonable under the circumstances, the court may not substitute its judgment for that of the agency."); *see also Mantech Telecomms. & Info. Sys. Corp.* v. *United States*, 49 Fed. Cl. 57, 65 (2001) (stating that in the context of a negotiated procurement the court "will not object to an agency's proposed corrective action provided it is 'reasonable under the circumstances[.]'"); *DGS Contract Serv., Inc.* v. *United States*, 43 Fed. Cl. 227, 233, 238 (1999) (a CO's decision to discuss certain price information "to make the procurement process more fair" was "reasonable because there is no evidence that the CO acted in bad faith."). That standard of review is relevant when the court's evaluation is made under the APA's "arbitrary and capricious" prong, but inapplicable where the record contains substantial evidence that one or more FAR provisions have been violated. *See* 5.U.S.C. § 706(2)(A).

Again, this was an issue raised at oral argument.

| | |
|---|---|
| GOVERNMENT COUNSEL: | The inquiry is whether what the Army did is reasonable.<br><br>It would help if examining and determining what the Army did was reasonable that you look at what the Army actually did rather than introducing your hired consultants that had nothing to do with this procurement and offered very little as far as substance as far as whether or not the Army's actions were reasonable. . . . |
| THE COURT: | Reasonableness is not in the statute. |
| GOVERNMENT COUNSEL: | But it's certainly that – |
| THE COURT: | The requirements for review under the statute are what? |
| GOVERNMENT COUNSEL: | Well, the requirements are that the Army's actions be -- an award may not be overturned unless it's determined the contracting officer, |

| | |
|---|---|
| | the contract, the government agency's decision was arbitrary and capricious. |
| THE COURT: | Or unlawful. |
| GOVERNMENT COUNSEL: | Or a significant violation of regulations that prejudice the Plaintiff.<br><br>In this case they're certainly not arbitrary and capricious.<br><br>* * * |
| THE COURT: | What I'm looking at is to determine whether or not there may be potential violation of law and, if so, is the mitigation proposal an actual remedy? Is that an adequate remedy to be an appropriate mitigation? |

8/17/07 TR 75-76.

The Administrative Record, in this case, evidences that Lockheed Martin employees working on the Task Order will have access to "*non-purchased*" care requirement information that will give Lockheed Martin an unfair competitive advantage in future procurements. *See, e.g.*, Adams Decl. ¶¶ 8-17 at 3-7 (AR 920-24); Richards Decl. ¶¶ 12-15 at 6-8 (AR 931-33). The competitive effect of this advantage is exacerbated by the fact that Lockheed Martin currently is one of the largest government contractors in the country. *See* Lockheed Martin Corporation, 2006 ANNUAL REPORT, at 2, 11 (estimating that "[in] 2006, 84% of . . . net sales [total sales were $39.6 billion] were made to the U.S. Goverment, either as a prime contractor or as a subcontractor."); *see also* Compl. ¶ 77 (alleging that Lockheed Martin "currently performs 18 [TRICARE] contracts classified as Category 3 with a total contract value of $114.595 [million]."); Cole, WALL ST. J. at A10 (reporting that Lockheed's growth plans call for securing more federal government contracts in "an array of behind-the-scenes services"). Under these circumstances, the fact that neither TMA nor the CO initially identified the "unequal access to information conflict" nor to date has identified an apparent "impaired objectivity conflict" significantly undermines the court's confidence, both in the CO's conflict identification and wholesale endorsement of a voluntary mitigation plan. *See* 48 C.F.R. §§ 9.505-1-4 (defining the types of OCIs the CO must identify and mitigate). And, as Lockheed Martin has admitted: "By continuing to win competitions in our traditional business, *we are positioned exceptionally well for sustained success in the defense*, homeland security, *and government information technology arenas*." Lockheed Martin Corporation, 2006 ANNUAL REPORT, at 4 (emphasis added).

Although the CO ultimately cured a prior failure to identify and analyze a potential "unequal access to information" conflict the CO did not identify the potential "impaired objectivity" conflict, as required by FAR § 9.504(a). In addition, the Administrative Record does not evidence that the

CO exercised sound discretion in developing an appropriate mitigation plan, as required by FAR § 9.504(e). *See* 48 C.F.R. § 9.504(e). To be sure, the Government arguably could rescind the contract if it was not satisfied with Lockheed Martin's mitigation efforts. Nevertheless, under the proposed mitigation plan, Lockheed Martin is not barred from performing "non-purchase" Category 3 contracts;[23] TMA's "Policy" and Lockheed Martin's "OCI Mitigation Plan and Competitive Analysis" have no binding effect at law;[24] and certain mitigation efforts, such as non-disclosure agreements, may be anticompetitive.

The Complaint in this case was not filed until July 17, 2007, after the GAO rejected three prior bid protests, concluding that "any potential future OCIs can be mitigated[.]" *See Axiom Resource Mgmt.*, Comp. Gen. B-298870.3, at 1. On July 18, 2007, Lockheed Martin was to commence performance of the Task Order, utilizing Plaintiff's former employees. *See* 7/17/07 TR at 6. In light of this situation and the fact that the Administrative Record had not been filed, the court declined to issue a Temporary Restraining Order on July 17, 2007. *See* 7/17/07 TR at 6-11, 17-18, 22.[25] After reviewing the Administrative Record, the briefs, and convening an oral argument, the court has determined that the CO abused his discretion in violation of FAR § 9.5 by awarding the Task Order to Lockheed Martin, without developing a mitigation plan that does not afford Lockheed Martin any significant competitive advantages, is enforceable, *i.e.*, subject to court order, and otherwise does not impose any anticompetitive effects on future competition. *See* 5 U.S.C. § 706(2)(A).

---

[23] A June 6, 2007 Memorandum prepared by the CO regarding the May 21, 2007 GAO letter states: "Lockheed has submitted a certification to the Goverment declaring themselves a Category 2 contractor, stating they are willing to divest themselves of all Category 3 work that they are performing under approved mitigation plans, at the Government's option and timing (AR, Tab 44)." AR 967. The court found no such certificate or statement either at AR 44 or Tab 44 of this record. Assuming such certificate exists, the obvious questions is why the CO did not request that divestiture? If Plaintiff's estimate that Lockheed Martin is performing $114.6 million of Category 3 contracts is correct, then why would Lockheed Martin be willing to divest that business in order to retain the Task Order in this case? *See* AR 464-65 (indicating a total 3 year term, with a maximum total estimate with optional CLINS at $12.044 million).

[24] Lockheed Martin was aware of this bid protests, but chose not to intervene. Accordingly, the court has no jurisdiction at present to incorporate the voluntary terms of Lockheed Martin's OCI Mitigation Plan and Competitive Analysis into an order.

[25] The court also rejected Plaintiff's argument that the potential OCI should be considered as part of the technical evaluation. *See* 8/7/07 TR at 43-46. In this case, the RFQ has four technical categories, none of which include OCIs. *See* AR 23. The FAR specifies that the CO "shall award the contract to the apparent successful offeror unless a conflict of interest is determined to exist that cannot be avoided or mitigated." 48 C.F.R. § 9.504(e). Therefore, whichever offeror has the superior proposal, based on all factors, should be awarded the contract, *unless* an OCI cannot be mitigated. *Id.*

The court is mindful that not every violation of the APA requires an equitable remedy: "We thus hold that, in a bid protest action, section 1491(b)(4) does *not* automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award." *PGBA*, *LLC* v. *United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004) (emphasis added); *see also Central Arkansas Maint., Inc.* v. *United States*, 68 F.3d 1338, 1343 (Fed. Cir. 1995) (citing *United States* v. *Mississippi Valley Generating Co.*, 364 U.S. 520, 564 (1961)) (the "public policy embodied in the conflict of interest statute [in *Mississippi Valley*] rendered the contract unenforceable"); *but see* 687 F.3d at 1342 ("not all violations of . . . [a] regulation are the same; only a 'clear and prejudicial' violation of a procurement statute or regulation warrants relief."). Accordingly, the United States Court of Appeals for the Federal Circuit has affirmed a ruling by the United States Court of Federal Claims declining to enter an injunction on "public interest grounds," even though the plaintiff established prejudicial error in the procurement process. *Id.* at 1223. In doing so, however, our appellate court recognized, "there is no evidence that Congress intended to abolish the tradition of equitable discretion in issuing injunctive relief when it enacted section 1491(b)(4) in ADRA." *Id.* at 1227; *see also id.* at 1226 ("This construction is consistent with the language of 28 U.S.C. § 1491(b)(2), which, through use of the permissive 'may,' provides the [United States] Court of Federal Claims with discretion in fashioning relief."). In deciding whether to issue an injunction and the scope thereof, the court is required to examine and balance four traditional factors, among which is the "public interest." *See PGBA*, 389 F.3d at 1227; *see also FMC Corp.* v. *United States*, 3 F.3d 424, 427 (Fed. Cir. 1993) (holding that no one of the four injunctive factors is determinative, and "the weakness of one factor may be overborne by the strength of the others.").

The Bureau of Competition of the Federal Trade Commission ("FTC") is the federal agency authorized to protect the public interest by monitoring and insuring that there is competition in the healthcare service industry. *See* Federal Trade Commission, *FTC Antitrust Actions in Health Care Services and Products* (Oct. 2003), *available at* http://www.ftc.gov/bc/hcupdate03/024.pdf; *see also* Federal Trade Commission, *Hearings on Health Care and Competition Law and Policy*, June 26, 2003, *available at* http://www.ftc.gov/ogc.healthcarehearings/030626ftctrans.pdf. Therefore, the court has decided, prior to determining whether the public interest requires the issuance of an injunction and the elements thereof, to request the views of the FTC Bureau of Competition as *amicus curiae* on or before December 15, 2007 to advise the court: (1) whether Lockheed Martin should be required to divest existing Category 3 contracts, if the current Category 2 award stands; (2) whether current "TMA Policy" and Lockheed Martin's voluntary mitigation efforts are sufficient to ameliorate the conflicts of interest at issue;[26] and (3) whether the non-disclosure agreements that Lockheed Martin has required Plaintiff's former employees to sign or other mitigation proposals may foreclose future competition for these services when the current Task Order expires in three years. *Compare* 8/7/07 TR 90-97, 102-04 *with* AR 606 ("Lockheed [Martin] considers any authorized release of procurement sensitive information by a Lockheed [Martin] employee to be a felony under

---

[26] *See* Keith R. Szeliga, *Conflict and Intrigue in Government Contracts: A Guide to Identifying and Mitigating Organizational Conflicts of Interest*, 35 PUB. CONT. L.J. 639, 667-68 (2006) ("'Impaired objectivity' OCIs often can be mitigated by recusal of the contractor that possesses the OCI, with the most effective recusal strategies incorporating mechanisms for detecting the OCI in advance so that the work is not assigned to the conflicted contractor.").

federal law. All Lockheed [Martin] employees providing support services to TMA at all locations either have executed or will be required to execute a non-disclosure agreement.");[27] *see also* Remarks of Chairman Deborah Platt Majoras, *The Role of Competitive Analysis in Regulatory Decisions*, AEI/Brookings Joint Center, May 15, 2007, at 15 ("Agencies can . . . make . . . decisions in ways that enhance rather than squelch competition and [the FTC] can refuse to allow firms to undermine or manipulate regulatory processes to gain government endorsed advantages.").

The Government contends that the court's request for the views of the Federal Trade Commission staff as *amicus* on the competitive issues central to the "public interest" determination that the court must make before entering an injunction, "would contravene well-established jurisprudence." Sept. 27, 2007 Def. Response at 2 (citing 28 U.S.C. § 516, 28 U.S.C. § 519, 5 U.S.C. § 3016, and *Kern River Co.* v. *United States*, 257 U.S. 147 (1921)). First, 28 U.S.C. § 516 provides that "the *conduct of litigation* in which the United States . . . is a party, . . . is reserved to offices of the Department of Justice[.]" (emphasis added). The court's request for an *amicus* does not supplant the Department's role in conducting this litigation, nor the responsibility of the Attorney General to "*supervise* all litigation in which the United States . . . is a party." 28 U.S.C. § 519 (emphasis added). Likewise, the court's request for an *amicus* does not direct the *amicus* to "secure . . . evidence[.]" 5 U.S.C. § 3106. More to the point the *amicus* is not a party to this case. The court has ruled herein that FAR § 9.504(e) has been violated. The court is not requesting the *amicus* to comment on that decision, but to provide their special expertise in healthcare competition to advise the court whether an injunction should be issued to address the competitive issues the court has identified and, if so, what the content of any such injunction should be.

It is well established that a court may request a government agency to appear as an *amicus* in aid of the court's exercise of injunctive authority. *See United States* v. *Providence Journal Co.*, 485 U.S. 693, 703-704 (1988); *Universal Oil Prods. Co.* v. *Root Refining Co.*, 328 U.S. 575, 581 (1946); *see also Atchinson, T. & S. F. Ry. Co.* v. *I.C.C.*, 580 F.2d 623, 630 (D.C. Cir. 1978) (Federal Trade Commission allowed to appear as *amicus* in a case challenging another federal agency's regulations). Likewise, it is well established that the court should not enter injunctive relief without weighing the relevant factors with informed judgment. *See PGBA*, 389 F.3d at 1231. By requesting the views of *amicus* on the important competitive issues raised in this case, the court is exercising its discretion to make a "public interest" determination in a manner that is informed. *See Kern River*, 257 U.S. at 155 (holding where a right to equitable relief "is clear and is asserted in the *public interest*, equitable relief, if otherwise appropriate is not withheld."); *see also* 4 AM. JUR 2d *Amicus Curiae* § 1 ("*Amicus Curiae* perform a valuable role for the judiciary precisely because they are nonparties who often have different perspectives from the principal litigants; *amicus curiae* presentations assist the court by broadening its perspective on the issues raised, and facilitate

[27] Plaintiff's former employees were hired by Lockheed Martin to work on the Task Order. *See* 7/17/07 TR at 6-11. Since these employees likely will acquire "procurement sensitive information," will the non-disclosure agreements prevent those employees from again working for Plaintiff or another contractor in three years, if Lockheed Martin is not selected or declines to compete? Will these non-disclosure agreements work to give Lockheed Martin a significant competitive advantage if and when a new RFQ is issued?

informed judicial consideration of a wide variety of information and points of view . . . . Although no specific rule permits *amicus* participation in the trial court, there is no rule prohibiting it, and there is no reason a trial judge should not have discretion to permit such participation, if it may be helpful to the court."). To the extent that the Department may wish to join the *amicus* in presenting views on the issues identified, the court would view that as a constructive exercise. Indeed, if the *amicus* perceives competitive concerns in the same light as the court, presumably the Department would embrace expert suggestions to address these concerns.

## IV. CONCLUSION.

For the reasons discussed herein, Plaintiff's July 25, 2007 Motion for Summary Judgment On The Administrative Record is Denied, In Part, and the Government's August 3, 2007 Cross Motion For Judgment On The Administrative Record is Granted, In Part. The court has determined that the public interest is best served by requesting the views of the Bureau of Competition of the Federal Trade Commission on the issues identified herein as *amicus curiae* on or before December 15, 2007, after which time the court will issue a Memorandum Opinion and Final Order as to whether a permanent injunction should be entered and the scope thereof.

**IT IS SO ORDERED.**

**s/Susan G. Braden**
**SUSAN G. BRADEN**
**Judge**