# In the United States Court of Federal Claims

No. 07-532C
Filed: February 26, 2008
**TO BE PUBLISHED**

| | | |
|---|---|---|
| AXIOM RESOURCE MANAGEMENT, INC., | * | |
| Plaintiff, | * | Administrative Procedure Act, 5 U.S.C. § 706; |
| v. | * | Bid Protest; |
| THE UNITED STATES, | * | Compliance Audit; |
| Defendant, | * | Mitigation Plan; |
| and | * | Organizational Conflicts of Interest, 48 C.F.R. § 9.5; |
| LOCKHEED MARTIN FEDERAL HEALTH INSURANCE, INC., | * | Permanent Injunction; |
| Defendant-Intervenor. | * | Post-Award Jurisdiction; |
| | * | Public Interest; |
| | * | Show Cause Order; |
| | * | Standing; |
| | * | Supplementation of the Administrative Record; |
| | * | Tucker Act, 28 U.S.C. § 1491(b)(4). |

**James S. DelSordo**, Argus Legal, LLC, Manassas, Virginia, Counsel for Plaintiff.

**William G. Kanellis**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**LTC James A. Lewis**, United States Army Legal Services Agency, Arlington, Virginia, Of Counsel.

**Marcia G. Madsen**, Mayer Brown LLP, Washington, D.C., Counsel for Defendant-Intervenor.

**MEMORANDUM OPINION AND FINAL ORDER GRANTING LIMITED INJUNCTIVE RELIEF.**

**BRADEN,** ***Judge***.

## I. THE COURT'S POST-DECISION INQUIRY REGARDING RELIEF.[1]

On September 28, 2007, the United States Court of Federal Claims held that the Contracting Officer ("CO"), in this case, violated Federal Acquisition Regulation ("FAR") § 9.504(a),[2] by not identifying a potential "impaired objectivity" conflict,[3] but awarding a TRICARE Management Activity ("TMA") contract for the United States Department of Defense's healthcare program to Lockheed Martin Federal Health Insurance, Inc. ("Lockheed Martin"). *See Axiom I*, 2007 U.S. Claims LEXIS 314, at *79 (Fed. Cl. Sept. 28, 2007). In addition, the court determined that the CO did not exercise sound discretion as required by FAR § 9.504(e) in developing an Organizational Conflict of Interest ("OCI")[4] mitigation plan to correct the belatedly identified "unequal access to information" conflict,[5] *i.e.*, a plan that: did not afford Lockheed Martin any significant competitive advantages; was enforceable, *i.e.*, subject to court order; and otherwise did not impose any anticompetitive effects on future competition. *Id*. at *80.

In considering what relief was appropriate, the court requested additional briefing on three questions: "(1) whether Lockheed Martin should be required to divest existing Category 3 contracts

---

[1] The complete statement of facts and procedural history is set forth in *Axiom Res. Mgmt*. v. *United States*, 2007 U.S. Claims LEXIS 314, at *79 (Fed. Cl. Sept. 28, 2007) ("*Axiom I*").

[2] Section 9.504(a) of the Federal Acquisition Regulation provides that the CO is required to: "identify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible." 48 C.F.R. § 9.502(a).

[3] An "impaired objectivity" conflict occurs when a government contractor has conflicting obligations under different government contracts, that compromises the contractor's ability to render impartial judgment. *See* 48 C.F.R. § 9.505-3; *see also Aetna Gov't Health Plans, Inc.*, Comp. Gen. B-254397.15, 1995 U.S. Comp. Gen. LEXIS 502, 1995 WL 449806 at *9.

[4] Section 9.502(c) of the Federal Acquisition Regulation provides that:

> An organizational conflict of interest may result when factors create an actual or potential conflict of interest on an instant contract, or when the nature of the work to be performed on the instant contract creates an actual or potential conflict of interest on a future acquisition. *In the latter case, some restrictions on future activities of the contractor may be required.*

48 C.F.R. § 9.502(c) (emphasis added).

[5] An "unequal access to information" conflict occurs when a government contractor has access to non-public information in connection with performance of a government contract that may afford a competitive advantage in subsequent competition for a government contract. *See* 48 C.F.R. § 9.505-4; *see also Aetna Gov't Health Plans, Inc.*, Comp. Gen. B-254397.15 at *8-9.

[Product Support],[6] if the current Category 2 [Program Management Support][7] award stands; (2) whether current TMA Policy and Lockheed Martin's voluntary mitigation efforts are sufficient to ameliorate the conflicts of interest at issue; and (3) whether the non-disclosure agreements that Lockheed Martin has required Plaintiff's former employees to sign or other mitigation proposals may foreclose future competition for these services when the current Task Order expires in three years." *Id*. at *84.[8]

On November 16, 2007, Lockheed Martin moved to intervene. On December 3, 2007, the court granted that motion.

On December 14, 2007, the Government filed a Response addressing the first two questions posed in the court's September 28, 2007 Memorandum Opinion and Order ("Def. Resp.").[9] On that same date, Lockheed Martin filed a Motion For Leave To File Motion And Memo To Correct The Record ("Int. Mot. to Correct"). Therein, the court was advised that Lockheed Martin recently became aware that "the categorizations of services for . . . TMA contracts are neither as formal nor as rigid as we previously understood." *Id*. at 2. Specifically, Lockheed Martin identified a Pharmacy Operation Center contract with TMA that entails both Category 2 and Category 3 work, but does not expire until August 2010. *Id*. at 3 (citing AR 85). In addition, a Military Health System Customer Support Center task order and MHS Composite Health Care System II contract also involve both Category 2 and Category 3 work. *Id*. at 4 (citing AR 78, 81). Lockheed Martin also represented that a TMA Aurora Shared Support IT Services Order that initially was awarded as a Category 3 contract, subsequently was modified to include Category 2 work. *Id*. at 4. In addition, Lockheed Martin

---

[6] *See* AR 5 at ¶ 1.4 (describing Category 3 work as "Product Support: Services or end items required to meet the mission requirements of TMA's non-purchased care activities and programs. This includes, for example: concept exploration and development; system design; system development and integration; COTS procurement and integration; internal development testing; deployment; installation; operations; and maintenance.").

[7] *See* AR 5 at ¶ 1.4 (describing Category 2 work as "Program Management Support: Services which assist TMA in planning and managing its activities and programs. This includes, for example: requirements analysis, acquisition support, budge planning and management, business process reengineering, program planning and execution support, and independent technical management support.").

[8] The court also requested the views of the Federal Trade Commission's Bureau of Competition as *amicus curiae* to advise the court on these questions. *See Axiom I*, 2007 U.S. Claims LEXIS 314, at *83-84. On December 13, 2007, the Commission declined to participate as *amicus curiae*. *See* Dec. 13, 2007 Letter from William Blumenthal, General Counsel, Federal Trade Commission.

[9] On December 20, 2007, the Government filed a Response To The Court's Request Of December 17, 2007 Relating To Employees Who Sign Non-Disclosure Agreements ("Gov't Resp. Disclosure").

advised the court that the Category 3 services being provided to TMA under a Theater Medical Information Program ("TMIP") contract would end on December 31, 2007. *See* Int. Mot to Correct at 1, 3.

The CO apparently was unaware of the totality of this information prior to awarding the contract at issue. *See* AR 607-09 (showing that the CO identified the MHS Customer Support Center Task Order, Theater Medical Information Program contract, and MHS Composite Health Care System II contract, but did not consider that they created a potential OCI, and listed the TMA Aurora Shared Support IT Services Order and Pharmacy Operation Center Service Support contract as creating a potential conflict regarding only Category 3 work).

On December 17, 2007, the court convened a conference to discuss Lockheed Martin's post-award post-decision correction to the record and the Government's December 14, 2007 Response to the court's September 28, 2007 Memorandum Opinion and Order. At that conference, Lockheed Martin indicated a willingness to incorporate the terms of the proposed mitigation plan[10] into a contract modification. *See* 12/17/07 TR at 12-14.[11] The court explained that this proposal was acceptable; however, the court was not satisfied that the plan would be enforced.

THE COURT: I don't have any problem with the mitigation efforts . . . other than they're voluntary.

> The Plaintiff's experts . . . and the [G]overnment's conduct in this case so far has convinced me that there will be very little oversight of those mitigation efforts . . . [T]he [G]overnment doesn't seem to even have the appreciation that [Lockheed Martin does about] the Category 2, 3 contracts, so [the Government is] in a hard position to argue to me that I can rely on them . . . . I'm not satisfied with where

[10] *See* AR 60-88 (Lockheed Martin August 14, 2006 OCI Mitigation Plan and Comparative Analysis, Lockheed Martin Corporate Policy Statement for OCI, and a List of Lockheed Martin Activities Supporting TMA).

[11] The proposed contract modification also would include: Lockheed Martin providing "the contracting officer [with] a report of *all* opportunities involving TMA that Lockheed Martin is proposing on," not just the opportunities flagged by Lockheed Martin as presenting a potential OCI; and Lockheed Martin's Director of Internal Audits "undertake[n] to monitor [Lockheed Martin's] compliance." *See* 12/19/07 TR at 7-8. The court was never provided a copy of the proposed contract modification by the Government or Lockheed Martin and therefore the Administrative Record does not evidence the proposed modification was executed.

we are in these Category 2 versus 3 contracts, and I'm not satisfied with the voluntary mitigation efforts.

*Id*. at 5.

* * *

THE COURT: FAR 9.502(c) authorizes restrictions on future activities where . . . a conflict [is] identified . . . . I've found a conflict . . . . And what I'm trying to do is ascertain exactly what [Lockheed Martin's] mitigation plans are going to be and see if those might be incorporated into an order now that [Lockheed Martin is] a party in the case.

*Id*. at 14-15.

LOCKHEED MARTIN'S COUNSEL: The concern I think we would have . . . with this order would be that it not be interpreted in a way such that the transaction-by-transaction analysis that the FAR requires doesn't get performed on the [G]overment side[.]

THE COURT: Well, the Plaintiff's experts convinced me that there [were] no [Government] personnel . . . even to watch over your shoulder[.]

I will set [the contract] aside based on the violation of the record . . . unless you're willing . . . to put these mitigation proposals in a court order. I'd like to have somebody responsible for reviewing them.

* * *

The [G]overnment obviously was awfully slow on the uptake[, but is] finally coming to grips with the fact that there was a conflict here. They did it. They did it late . . . . [Lockheed Martin] now say[s], well, the [G]overnment doesn't understand these contracts very well. There's a lot of flexibility between 2 and 3. Well, that may be, but the [G]overnment didn't tell

> me that . . . . I'm concerned about these mitigation efforts to be sure they've got some teeth in them[.]

*Id*. at 17-19.

* * *

| | |
|---|---|
| GOVERNMENT COUNSEL: | [T]o ameliorate some of your concerns, it may be possible, and I would have to speak with the representatives of the TMA – |
| THE COURT: | Yes. |
| GOVERNMENT COUNSEL: | Lieutenant Colonel Lewis and I would have to speak with individuals at the TMA. |
| THE COURT: | Okay. |
| GOVERNMENT COUNSEL: | But we might also be able to provide some assistance in monitoring the contract if that satisfies monitoring the – |
| THE COURT: | Well, I want to be sure I've got a real monitor there. I mean, I am not impressed with what the CO did in this procurement. He came to the [OCI] issue kicking and screaming . . . So I don't want to [put] it back in the hands of the same office that got us kind of where we are now. |

*Id*. at 26-27.

On December 19, 2007, the court convened another conference. Although the Government initially appeared to agree to incorporate the terms of Lockheed's mitigation plan into a court order (*see* 12/19/07 TR at 2-4), the Government ultimately refused to allow an independent auditor to monitor compliance with the mitigation plan.

| | |
|---|---|
| GOVERNMENT COUNSEL: | [W]e're not in a position to alter in any way the contracting officer's responsibilities with respect to monitoring the administration of the contract. |

*Id*. at 4.

* * *

| | |
|---|---|
| THE COURT: | What I'm really trying to do is find someone that [Lockheed Martin] trust[s], that the [G]overnment trust[s] that could be a pair of independent eyes for the Court on this[,] because of the lateness and reluctance of the CO to identify what I found was a violation of the FAR, not to mention the fact that . . . [the CO] apparently [was not] familiar enough [with the types of work performed under Category 2 and Category 3 contracts] to identify what [Lockheed Martin was] able to do for me . . . . I don't know if I can put it any better than to say that I've kind of lost confidence in this CO's ability to be the proper person to monitor this . . . . And it can't be that there's not somebody that can do this job internally within the government[.] |

*Id.* at 5-6.

* * *

| | |
|---|---|
| GOVERNMENT COUNSEL: | I want to be clear and I want the court to understand the [G]overnment's position. That is a request that we are unable to accede to . . . I'm sure Your Honor is very well aware, the jurisdictional statute granting the Court jurisdiction over bid protests I think discusses the need for expedited consideration. |
| THE COURT: | I think you're getting an expedited consideration. |

| | |
|---|---|
| GOVERNMENT COUNSEL: | Right. However, if the Court were to retain jurisdiction, that would preclude us from appealing let's say. Let me just speak hypothetically for a moment. Let's just say -- |
| THE COURT: | If I put [the mitigation plan] in an order, it prohibits you from appealing? |
| GOVERNMENT COUNSEL: | No, Your Honor. The idea that let's just say down the road, let's just say, worst-case scenario, there was no compliance, there was some problem with Lockheed's compliance. |
| THE COURT: | Right, right. |
| GOVERNMENT COUNSEL: | Say that you got one of these. |
| THE COURT: | And the [G]overnment did nothing about it. |
| GOVERNMENT COUNSEL: | Right. And there was that. The problem with that is that the Court would then be serving as the administrator, the *de facto* administrator of the contract. |
| THE COURT: | No. I could set aside the contract then, period. |
| GOVERNMENT COUNSEL: | Right. And, Your Honor, I guess that's what we are saying. It's either the contract stands or the contract falls. |
| THE COURT: | Okay. Well, that's an interesting question . . . . if the Court doesn't have authority to enforce its orders, then I want to hear that from the Federal Circuit . . . . [H]ow do I know [if] there's a problem? How does the Plaintiff know? [L]et's say the deal goes through . . . . So four weeks from now, you all go ha, ha, ha, we really pulled one over on [the court]. You just ignore this, and who knows what you're |

| | |
|---|---|
| | going to wind up doing. The Plaintiff won't know. I won't know. |
| GOVERNMENT COUNSEL: | Well, Your Honor, the distinction I would draw is that there would be an obligation on behalf of the Army to follow the guidance as far as I'm concerned. |
| THE COURT: | But there was an obligation on the Army to comply with the FAR and they didn't do it. |
| | * * * |
| THE COURT: | I've given you the best shot I can give you on this. I feel very uncomfortable with . . . the way the procurement was handled. I gave the [G]overnment the benefit of the doubt on every other legal issue that came before . . . and I found a violation of the FAR . . . I found a violation of the law. I'm not going to say in this set of circumstances that that's okay, just go about your business. I don't want to set the contract aside, but you give me no choice. |

*Id*. at 10-14.

On December 20, 2007, the court issued an order for the parties to show cause by January 15, 2008, why the court should not enter an order that designated the United States Army Audit Agency ("USAAA")[12] to submit an annual compliance report to the court regarding implementation of the proposed mitigation plan. *See* Show Cause Order, *Axiom Res. Mgmt*. v. *United States*, No. 07-532 (Dec. 20, 2007); *see also* 12/20/07 TR at 3-6, 9-10.

On January 15, 2008, the Government filed a Response To The Court's Show Cause Order objecting, because the proposed order would allow the court to retain jurisdiction over future contract compliance, which exceeds the court's authority in bid protests. *See* Gov't Resp. To Show Cause at 3 (quoting *N. Telecom, Inc*. v. *United States*, 8 Cl. Ct. 376, 381 (1985) ("Protests, like this one, alleging that the awardee will not deliver equipment in conformance with contract requirements concern matters of contract administration, which are the responsibility of the contracting agency and which are not considered under our bid protest function.")). The Government also maintained that the court's proposed order would divest the CO of authority to administer the contract. *Id*. at

[12] *See* U.S. Army Audit Agency Home Page, http://www.hqda.army.mil/aaaweb (The "[USAAA] serves America's Army by providing *objective and independent* auditing services[,] help[s] the Army make informed decisions, resolve issues, use resources effectively and efficiently, and satisfy statutory and fiduciary responsibilities.") (emphasis added).

5 (citing FAR 1.602-2) ("Contracting officers are responsible for ensuring performance of all necessary actions for effective contracting, ensuring compliance with the terms of the contract, and safeguarding the interests of the United States in its contractual relationships. In order to perform these responsibilities, contracting officers should be allowed wide latitude to exercise business judgment."). In addition, the Government asserted that the proposed use of the USAAA would be unprecedented, contrary to the USAAA's functions and auditing standards, and imprudent. *Id*. at 7-10.

## II. DISCUSSION.

### A. Governing Precedent Regarding Relief In Bid Protest Cases.

As a matter of law, the United States Court of Federal Claims, "[t]o afford relief in [a bid protest] action[,] . . . may award *any* relief that the court considers proper, *including* declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2) (emphasis added). The United States Court of Appeals for the Federal Circuit, however, has held that the court is not necessarily required to enjoin arbitrary, capricious, or otherwise unlawful contract awards. *See PGBA, LLC* v. *United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004) ("We thus hold that, in a bid protest action, [28 U.S.C. §] 1491(b)(4) does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award."). Before deciding whether to issue an injunction, however, the court must consider: "(1) whether . . . the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *See PGBA*, 389 F.3d at 1228-29 (quoting *Amoco Prod. Co.* v. *Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.")). None of these individual factors is determinative and "the weakness of . . . one factor may be overborne by the strength of the others." *FMC Corp.* v. *United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

### B. The Relief Requested In This Case.

The July 17, 2007 Complaint in this case requested the following relief:

1. That the court enjoin [the Government] from permitting performance of any contract under Request For Quotation No. 154160.

2. Or in the alternative enjoining [the Government] from employing the funds obligated to the performance of any contract awarded to LMFH, LMIT, or any other entity other than [Plaintiff] for the services sought under the RFQ.

3. That in any event [Plaintiff] be awarded its reasonable costs and attorneys fees, and such further relief as is determined just and fair.

*See* Compl. at 23; *see also* Pl. Mot., *Axiom Res. Mgmt*. v. *United States*, No. 07-532 (July 25, 2007), at 2 ("WHEREFORE Plaintiff respectfully requests that the Court issue an order immediately enjoining the Government from taking the actions described above or in the alternative enjoining Army from employing the funds obligated to the performance of a contract to provide the services required under the RFQ of any contract awarded to LMFH or any other source with an unmitigated OCI.").

### C. The Court's Resolution.

#### 1. Plaintiff Has Demonstrated Success On The Merits.

The Complaint alleges that the contract award to Lockheed Martin was unlawful, because Lockheed Martin "possesses an OCI, its existing alleged mitigation plan is inadequate, and there is strong potential for future OCIs that the Government has failed to consider or adequately address." *See* Compl. at 2. The court has determined that the CO did not identify and analyze a potential "unequal access to information" conflict, as required by FAR § 9.504(a), and abused his discretion in violation of FAR § 9.504(e) by awarding the Task Order to Lockheed Martin, without developing a mitigation plan that does not afford Lockheed Martin any significant competitive advantages, is enforceable, and otherwise does not impose any anticompetitive effects on future competition. *See Axiom I*, 2007 U.S. Claims LEXIS 314, at *79-81 (citing 5 U.S.C. § 706(2)(A)). Therefore, Plaintiff has demonstrated success on the merits.

#### 2. Plaintiff Has Established Irreparable Harm.

The second consideration in weighing the appropriateness of injunctive relief is whether the plaintiff will suffer irreparable harm. *See PGBA*, 389 F.3d at 1229. When assessing this factor, "the relevant inquiry is whether the protestor has an adequate remedy in the absence of an injunction." *OTI Am., Inc.* v. *United States*, 68 Fed. Cl. 646, 659 (2005) (quoting *PGBA*, 60 Fed. Cl. at 221, *aff'd*, 389 F.3d 1219 (2004)).

The United States Court of Federal Claims has held that a protester suffers irreparable injury when deprived the opportunity to compete fairly for a contract. *See Cardinal Maint. Serv., Inc.* v. *United States*, 63 Fed. Cl. 98, 110 (2004) ("It is well-settled that a party suffers irreparable injury when it loses the opportunity to compete on a level playing field with other bidders[.]") (citing *Hunt Bldg. Co., Ltd.* v. *United States*, 61 Fed. Cl. 243, 280 (2004) (The awardee "will be harmed by having to undergo a recompetition-but not as severely as [the losing bidder] would be, if the unfair selection were allowed to stand." The awardee "will still be able to compete, this time on equal footing . . . whereas absent injunctive relief, [the losing bidder] will have been unfairly denied a meaningful opportunity to compete. On balance, injunctive relief is warranted to remedy the unfair process here.")); *see also SAI Indus.* v. *United States*, 60 Fed. Cl. 731, 747 (2004) ("Irreparable injury can be shown in the 'form of lost opportunity to fairly compete for and perform work under

the contract, including but not limited to lost profits that would generate therefrom.'") (quoting *Metcalf Constr. Co., Inc.* v. *United States*, 53 Fed. Cl. 617, 645 (2002)).

In this case, the Government made an unfair selection in awarding the contract to Lockheed Martin, without requiring an adequate mitigation plan. *See Parcel 49C Limited Partnership* v. *United States*, 31 F.3d 1147, 1151 (Fed. Cir. 1994) (recognizing that the Government has a "duty to conduct a fair procurement."); *see also Hunt*, 61 Fed. Cl. at 280. In addition, Plaintiff has estimated that the contract represents approximately 10% of Plaintiff's overall business. *See* 8/7/07 TR at 6; *see also Cardinal Maint. Serv.*, 63 Fed. Cl. at 110 ("Irreparable injury includes, but is not limited to, lost profits which would flow from the contract.") (citing *SAI Indus.*, 60 Fed. Cl. at 747)). Therefore, Plaintiff has established that it will suffer irreparable harm, if the court does not grant injunctive relief.

**3. In This Case, The Balance Of The Hardships Disfavors Injunctive Relief.**

The third consideration is whether the balance of hardships to the respective parties favors injunctive relief. *See PGBA*, 389 F.3d at 1229. Injunctive relief, in this case, would interfere to some degree with the Government's effort "[t]o provide administrative program management support of TAD's TRICARE's acquisition initiatives," and the "successful accomplishments of these duties . . . result[ing] in the development [of] a suite of T-3 RFPs, smooth transitions of the contracts and the successful defense of any procurement protests." AR 4; *see also* Def. Resp. at 2-3 (citing AR 794; *PGBA*, 389 F.3d at 1228-29 ("[T]he balance of hardships and the public interest favored allowing . . . [the contract awardee] to proceed with the contract.")). Moreover, since Lockheed Martin commenced performance under the contract on July 18, 2007, setting aside the award at this juncture mitigates against the issuance of injunctive relief.

**4. In This Case, The Public Interest Weighs In Favor Of Limited Injunctive Relief.**

The final consideration is whether injunctive relief is in the public interest. *See PGBA*, 389 F.3d at 1229. The United States Court of Federal Claims has held that "[i]t is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations." *See Labat-Anderson, Inc.* v. *United States*, 65 Fed. Cl. 570, 581 (2005) (citations omitted); *see also Hunt Bldg.*, 61 Fed. Cl. at 280 ("Plaintiff has shown that granting a permanent injunction will serve the public interest by ensuring that the selection process under this Solicitation is conducted fairly. Otherwise, the Air Force's violations would have the adverse effect of undermining the integrity of the competitive process for privatizing military housing. In granting injunctive relief, public confidence in that process will be preserved.") (citations omitted); *SAI Indus.*, 60 Fed. Cl. at 747 ("The public's interest is clearly served when suppliers engage in fair and robust competition for government contracts. Healthy competition ensures that the costs to the taxpayer will be minimized. Additionally, granting this injunction will ensure that this procurement is conducted according to all applicable procurement laws and regulations.") (citing *Metcalf Constr.*, 53 Fed. Cl. at 645); *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L.* v. *United States*, 56 Fed. Cl. 502, 521 (2003) ("[T]he public interest is served by enforcing a procurement process that conforms with

regulatory authority and the solicitation's evaluation criteria.") (citing *Essex Electro Eng'rs, Inc.* v. *United States*, 3 Cl. Ct. 277, 288 (1983)).

In this case, the Government argues that:

> It is in the public interest to prevent disruption of the TRICARE Management Activity contracts and ensure that service members' medical services are provided and administered in a timely fashion . . . . If the subject contract were interrupted, contracts in place to provide the services would also be interrupted, and recipients may cease to receive healthcare services. Thus, even if the Court in this case were to conclude that there exists an Organizational Conflict of Interest that cannot be mitigated, it is not in the public interest to subject the TMA and service members to delays in the administration of medical care claims that would attend injunctive relief.

*See* Def. Resp. at 2-3.

These factors, however, are relevant to the balance of hardships, rather than the "public interest" determination. Even though the Government has not explained why services necessarily would be disrupted, the court has given the Government the benefit of the doubt, as discussed above.

Assuming, *arguendo*, that setting aside the contract may interfere to some degree with the administration of the TRICARE Management Activity, this burden is outweighed by the public interest of ensuring that the ultimate awardee presents no potential or actual conflicts of interest that are not adequately mitigated. As the court explained in *Axiom I*, "[e]stablishing the parameters of access to and use of [proprietary or private] information will be among the most important decisions that the United States Court of Federal Claims and the United States Court of Appeals for the Federal Circuit will make in the next few years – not only for government contract jurisprudence, but to maintain competition in" government contracting. *Axiom I*, 2007 U.S. Claims LEXIS 314, at *1-2; *see also* Ralph C. Nash, *Postscript: Organizational Conflicts of Interest*, 22 No. 1 NASH & CIBINIC REPORT ¶¶ 1, 4 (Jan. 2008) ("NASH & CIBINIC REPORT, Jan. 2008") ("It seems clear that mitigation issues are and will continue to be difficult issues when contractor employees are scattered throughout the offices of a Government agency."); Richard Rector, *Infotech and the Law Commentary*: *Courts Crackdown On Organizational Conflicts*, WASH. TECH. (Nov. 12, 2007) ("Federal courts have confirmed in two recent decisions the importance of scrupulously following OCI rules for competitive and compliance reasons.") (citing *Axiom I* and *United States* v. *Scis. Applications Int'l Corp.*, 502 F.Supp.2d 75, 78 (D.D.C. 2007) (declining to dismiss a complaint alleging that the government contractor violated the False Claims Act, 31 U.S.C. § 3729, by failing to disclose an OCI).

The contract at issue for program management support services for the TRICARE Acquisitions Directorate is central to TMA's mission. *See* Richards Decl. ¶¶ 5-7 at 3-4 (AR 928-29) (TMA is responsible for the policy, management, and budget of TRICARE programs, including "purchased healthcare, provided by TRICARE contractors" and "non-purchased" healthcare, provided by the Military Health System's network of military hospitals and clinics.). As such, the

potential "unequal access to information" and "impaired objectivity" conflicts may undermine ongoing and future TRICARE management activity, if not adequately mitigated. As the court previously observed, the conflicts at issue are exacerbated by the fact that Lockheed Martin currently is one of the largest government contractors in the country, with a business model that seeks to increase business by leveraging its market position in "defense, homeland security, and government information technology" contracts.[13]

As discussed in *Axiom I*, Mr. Ronald G. Richards, TMA's Chief of Central Operations Office and Head of the Contracting Authority (2001 until his retirement in 2006), submitted an affidavit in support of Plaintiff's Motion for Judgment on the Administrative Record and an Injunction, to inform the court that "[b]y the very nature [of] the *interdependency between the purchased care and non-purchased care elements of the TRICARE program*[,] any change to TRICARE will most likely effect a change in either a TMA or non-purchase care information system, [t]hereby giving any contract personnel working on this effort access to non-purchase care requirements." *See Axiom I*, 2007 U.S. Claims LEXIS 314, at *71 (citing Richards Decl. ¶ 1 at 1-2 (AR 926-27) (emphasis added)). Therefore, "[w]hen the contract requirements for the non-purchase care information system are being developed by the TRICARE Acquisitions Directorate they will be supported by the [Lockheed Martin] contract employees." *Id*. In turn, "[t]his will require the [Lockheed Martin] contract employees to acquire access to extensive data concerning non-purchased care contractor requirements." *Id*. For this reason, both Mr. Richards and Ms. Nancy R. Adams, Senior Advisor to the Director of TMA (July 2002-April 2004) and Regional Director for the Northern TRICARE Regional Office (April 2004 to her retirement in August 2005) advised the court that, if Lockheed Martin is to be awarded the Task Order in this case, Lockheed Martin also should be prohibited from performing "non-purchased care Category 3 contracts." *See Axiom I*, 2007 U.S. Claims LEXIS 314, at *65-66, 72 (citing Adams Decl. ¶ 17 at 7 (AR 924); Richards Decl. ¶¶ 13-14 at 7 (AR 932)).

---

[13] *See Axiom I*, 2007 U.S. Claims LEXIS 314, at *77-78 (citing Lockheed Martin Corporation, 2006 ANNUAL REPORT, at 2, 11 (estimating that "[in] 2006, 84% of . . . net sales [total sales were $39.6 billion] were made to the U.S. Goverment, either as a prime contractor or as a subcontractor.")); *see also* Compl. ¶ 77 (alleging that Lockheed Martin "currently performs 18 [TRICARE] contracts classified as Category 3 with a total contract value of $114.595 [million]."); August Cole, *Lockheed Looks Beyond Weapons: Contractor Targets Growth With Services In Strife-Torn Areas*, WALL ST. J., Sept. 24, 2007, at A10 (reporting that Lockheed Martin's growth plan calls for securing more federal government contracts in "an array of behind-the-scenes services"); Lockheed Martin Corporation, 2006 ANNUAL REPORT, at 4 ("By continuing to win competitions in our traditional business, *we are positioned exceptionally well for sustained success in the defense*, homeland security, *and government information technology arenas*.") (emphasis added).

Lockheed Martin's dominance in the field of government information technology was evidenced again this month by the award of a $1 billion 10-year contract with the FBI to develop "what is expected to be the world's largest crime-fighting computer database of biometric information, including fingerprints, palm prints, iris patterns and face images." Ellen Nakashima, *Lockheed Secures Contract to Expand Biometric Database*, WASH. POST, Feb. 13, 2008, at D1.

The court is not willing to require divestiture of Lockheed Martin's existing Category 3 contracts on this record. The RFQ, however, stated: "For purposes of identifying, avoiding, and/or mitigating against OCIs, *TMA will examine* all of its non-purchased care requirements and acquisitions." *See* AR 5 (RFQ Section 1.4) (emphasis added). Lockheed Martin's proposal did not identify that the following contracts concerned both Category 2 and 3 work: (i) MHS Customer Support Center Task Order (expires November 2009); and (ii) MHS Composite Healthcare System II Contract (expires November 2009). *Compare* AR 74-99 (Lockheed Martin Operational Conflicts of Interest: List Of Lockheed Martin Activities Supporting TMA) *and* AR 608 (March 28, 2007 OCI Review Information Memorandum) *with* Int. Mot. to Correct; *see also Sci. Applications Int'l Corp.*, 502 F. Supp. 2d at 78. Therefore, in "correcting the record," Lockheed Martin admitted to the "interdependence" between Category 2 (Program Management Support) and Category 3 (Product Support), stating that these contracts do not have "impermeable boundaries and you are one or the other." 12/17/07 TR at 6.[14] This representation lends further credibility to the testimony of Mr. Richards and Ms. Adams. *See Axiom I*, 2007 U.S. Claims LEXIS 314, at *65-72; *see also* NASH & CIBINIC REPORT, Jan. 2008 at 4 ("In *Axiom*, the issue was made very complex because the agency was buying contractor support in different categories that were highly interrelated. Buying all of the staff support in one procurement would have slowed the problem, provided the contractor was then barred from all other contracts with the agency.").

Therefore, the Government and Lockheed Martin's offer to incorporate the proposed mitigation plan as a modification to the contract, without affording the court the ability to insure compliance by an independent auditor, likely will prove illusory. *See* 12/19/07 TR at 7-8. Given the fact that the CO repeatedly failed properly to identify or mitigate the OCIs at issue in this case, the court has little confidence that the CO will identify and properly mitigate potential or actual OCIs in the future. *See Axiom I*, 2007 U.S. Claims LEXIS 314, at *78-80. Surprisingly, the Government argues that a compliance auditor would usurp the CO's function to administer the contract. *See* Gov't Resp. To Show Cause at 3. The court does not view an independent auditor as interfering with the CO's responsibilities to administer the contract, because the auditor's function is to ensure compliance with the court's order. *See* 28 U.S.C. § 1491(b)(1) ("To afford relief in [a bid protest] action[, the court] may award *any* relief that the court considers proper[.]")*; see also Abbott Labs.* v. *Novopharm Ltd*., 104 F.3d 1305, 1309 (Fed. Cir. 1997) (affirming that a trial court "has inherent power to order the parties to the litigation to act in a manner that will enforce its judgment.") (citing *Shillitami* v. *United States*, 384 U.S. 364, 370 (1966)). The Government, however, has stated that it would *prefer* that the court set aside the award, rather than have an independent auditor oversee compliance with Lockheed Martin's proposed mitigation plan. *See*

---

[14] Lockheed Martin's December 14, 2007 Motion To Correct The Record listed the following as including Category 3 work *as well as some* Category 2 work: (i) Pharmacy Operations Center sub-contract (expires: August 10, 2010); (ii) MHS Customer Support Center Task Order (expires November 2009); and (iii) MHS Composite Healthcare System II Contract (expires November 2009). *See* Int. Mot. to Correct at 2-4. In addition, a contract for TMA Aurora Shares Support was listed as Category 3 in the proposal, but subsequently was changed to Category 2 by amendment. *Id*. Lockheed Martin's August 14, 2006 proposal listed these as only Category 3 contracts. *See* AR 78, 81-84 (Aug. 14, 2006 Lockheed Martin Proposal).

12/19/07 TR at 13 (GOVERNMENT COUNSEL: "And, Your Honor, I guess that's what we're saying. It's either the contract stands or the contract falls."). Accordingly, the court has determined that the public interest weighs in favor of injunctive relief.

In light of the fact that the initial term of the contract expires on July 21, 2008, at which time the Government may exercise two one-year options (*see* AR 472-77 (September 19, 2006 Contract W81XWH-06-F-0440)), the court has decided to issue an injunction, effective on that date, setting aside the continuation of the contract through the exercise of options. This limited injunctive relief allows the Government ample time to re-solicit the contract, if it wishes, while minimizing disruption to ongoing performance. *See Parcel*, 31 F.3d at 1153 (quoting *United States* v. *John C. Gimberg Co.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983)) (advising that the court's equitable powers "should be exercised in a way which best limits judicial interference in contract procurement."); *see also* Gov't Resp. Disclosure (Dec. 19, 2007 Decl. of Ms. Suzanne Curtis) (representing that employees who sign Government non-disclosure agreement will not be prohibited from obtaining work with any follow-on contractor); 12/19/07 TR at 3 (same).

### D. Plaintiff May File Bid Preparation And Proposal Costs And Potential Attorneys' Fees.

Plaintiff has requested bid preparation and proposal costs and attorneys' fees associated with this protest. *See* Compl. at 23 ("That in any event [Plaintiff] be awarded its reasonable costs and attorneys fees, and such further relief as is determined just and fair."). Under the Tucker Act, the court may award monetary relief in post-award bid protests on "bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2); *see also E.W. Bliss Co.* v. *United States*, 77 F.3d 445, 447 (Fed. Cir. 1996) ("The theory on which an unsuccessful bidder is awarded its bid preparation costs is that the government violated its implied contract to have the involved bids fairly and honestly considered.") (internal quotation and citations omitted); *MVM, Inc.* v. *United States*, 47 Fed. Cl. 361, 366 (2000) ("[T]he plain language of 28 U.S.C. § 1491(b)(2) permits the grant of proposal and preparation costs *as well as* injunctive relief.") (emphasis added). Accordingly, Plaintiff may file an appropriate motion and supporting documentation to recover bid preparation and proposal costs. In addition, Plaintiff may file for attorneys' fees, if Plaintiff qualifies under the Equal Access to Justice Act, 28 U.S.C. § 2412(b).

## IV. CONCLUSION.

For the aforementioned reasons, Plaintiff's July 25, 2007 Motion for Judgment on the Administrative Record is granted, in part. The United States Army's contract award to Lockheed Martin Federal Health Insurance, Inc., for Request For Quotation No.154160, is set aside, effective July 21, 2008.

Plaintiff may move, in this case, for bid preparation and proposal costs, pursuant to 28 U.S.C. § 1491(b)(2), and for other costs, pursuant to 28 U.S.C. § 1920. In addition, if Plaintiff qualifies, Plaintiff may move for an award of attorneys' fees and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412(b).

The Clerk of the United States Court of Federal Claims is directed to enter judgment in accordance with this Memorandum Opinion and Final Order, pursuant to RCFC 54(b).

**IT IS SO ORDERED.**

**s/Susan G. Braden**
**SUSAN G. BRADEN**
**Judge**